# EXHIBIT B

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:               )        CDC Number E-89355
                          )
MARTIN CASTANEDA          )
                          )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MARCH 15, 2006

8:55 A.M.


PANEL PRESENT:

Ms. Tracy St. Julien, Presiding Commissioner
Mr. Rolando Mejia, Deputy Commissioner


OTHERS PRESENT:

Mr. Martin Castaneda, Inmate
Mr. David Spowart, Attorney for Inmate
Mr. James Jacobs, Deputy District Attorney


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No       See Review of Hearing
_____  Yes      Transcript Memorandum


**Sheri Robinson, Peters Shorthand Reporting**

ii

## INDEX

PAGE

Proceedings....................................... 1

Case Factors...................................... 7

Pre-Commitment Factors............................ 23

Parole Plans...................................... 38

Recess............................................ 71

Decision.......................................... 72

Adjournment....................................... 90

Transcriber Certification......................... 92

--oOo--

1

1           <u>P R O C E E D I N G S</u>

2           **PRESIDING COMMISSIONER ST. JULIEN:**  The

3    time is 8:55 a.m. and this is a Subsequent

4    Parole Hearing for Martin Castaneda CDC number

5    E-89355. Today is March 15, 2006. We are at CTF,

6    Soledad.  Mr. Castaneda was received March 21,

7    1991. Life term starting the same day, count

8    one. Attempted Murder, First. Penal Code Section

9    187 and 664. Term received seven years to life.

10   Minimum eligible parole date March 21, 1998 in

11   the County of Los Angeles. Case number KA005779.

12   Is that correct, sir?

13          **INMATE CASTANEDA:**  Yes.

14          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

15   we are tape recording the hearing today. So, we

16   are going to go around the room and introduce

17   ourselves. We'll say our names, our first and

18   last names. Spell our names and the reason why

19   we are here. After you say your name, also state

20   your CDC number.  My name is Tracy St. Julien,

21   T-R-A-C-Y-S-T, Capital J-U-L-I-E-N.

22          **DEPUTY COMMISSIONER MEJIA:**  Rolando

23   Mejia, M-E-J-I-A, Deputy Commissioner.

24          **DEPUTY DISTRICT ATTORNEY JACOBS:**  James

25   Jacobs, J-A-C-O-B-S. Deputy District Attorney,

26   Los Angeles County.

27          **ATTORNEY SPOWART:**  David Spowart, S-P-O-

2

1   W-A-R-T. Attorney for Mr. Castaneda.

2          **INMATE CASTANEDA:**  Martin Castaneda, C-A-

3   S-T-E-N-E-D-A. CDC number E-8-9-3-5-5.

4          **PRESIDING COMMISSIONER ST. JULIEN:**  We

5   also have two correctional officers in the room

6   for security purposes.  I'm sorry, can you spell

7   your last name again?

8          **INMATE CASTANEDA:**  C-A-S-T-E-N-E-D-A.

9   Everywhere I'm looking it says A-N.

10          **INMATE CASTANEDA:**  That's what they did

11   when I got to (indiscernible).

12          **PRESIDING COMMISSIONER ST. JULIEN:**  But

13   it should be E.

14          **INMATE CASTANEDA:**  E-N.  Well, I'll

15   correct it on here. I don't know if it's going

16   to make a difference anywhere. Mr. Spowart,

17   could you – you've gone over any ADA issues.

18          **ATTORNEY SPOWART:**  And he read verbatim

19   so I have no objections.

20          **PRESIDING COMMISSIONER ST. JULIEN:**  Just

21   do a little switch there. Okay? So you're

22   familiar with your ADA rights?

23          **INMATE CASTANEDA:**  Yes.

24          **PRESIDING COMMISSIONER ST. JULIEN:**

25   Accommodation for disabilities. Do you have any

26   disabilities that would require any

27   accommodation?

3

1        **INMATE CASTANEDA:**  No, I don't.

2        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

3   This is your third? So, you're pretty familiar

4   with the procedure?

5        **INMATE CASTANEDA:**  Yes, I am.

6        **PRESIDING COMMISSIONER ST. JULIEN:**  Do

7   you have any questions about the procedure

8   today?

9        **INMATE CASTANEDA:**  No, I don't.

10        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

11   I am looking at the procedure form and the ADA

12   form that you and your attorney went over and

13   signed. And that looks in order. I also looked

14   at the BPT Form 1073 that discusses your

15   accommodations for disabilities and I know that

16   you signed that on April 13, 2005.  It was

17   checked that you did not need any

18   accommodations.  Okay.  So is there any reason

19   why you cannot fully participate today?

20        **INMATE CASTANEDA:**  No, there isn't.

21        **PRESIDING COMMISSIONER ST. JULIEN:**  Mr.

22   Spowart, are you satisfied your client's ADA

23   rights have been met?

24        **ATTORNEY SPOWART:**  Yes, I am.

25        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

26   and how did that hearing checklist –

27        **ATTORNEY SPOWART:**  I have everything.

4

1          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
2   Mr. Jacobs, have you had a chance to look at
3   that hearing checklist yet?
4          **DEPUTY DISTRICT ATTORNEY JACOBS:**  Yes, I
5   looked at it when I received it. Plus I got some
6   updates –
7          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
8   yes. The updates.
9          **ATTORNEY SPOWART:**  Commissioner,
10  (indiscernible) I believe you said this would be
11  his third appearance. This is his third
12  subsequent – this is his fourth hearing.
13          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
14  thank you. Now do you have any additional
15  documents, Mr. Spowart?
16          **ATTORNEY SPOWART:**  No, not at this time.
17          **INMATE CASTANEDA:**  I have a support
18  letter from my father and a close family friend
19  who's got his own business that offered me –
20          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
21  now those weren't included in –
22          **DEPUTY COMMISSIONER MEJIA:**  Is that June
23  5, 2005?
24          **INMATE CASTANEDA:**  Pardon?
25          **DEPUTY COMMISSIONER MEJIA:**  Is that dated
26  June 5, 2005?
27          **INMATE CASTANEDA:**  Yes, it is.

5

1        **DEPUTY COMMISSIONER MEJIA:**  Yes, I got it
2   in the file.
3        **PRESIDING COMMISSIONER ST. JULIEN:**  Yes,
4   I have quite a few letters. Is that Manuel
5   Castaneda?
6        **INMATE CASTANEDA:**  Yes, that's my father
7   - yes.
8        **PRESIDING COMMISSIONER ST. JULIEN:**  Well,
9   that's the only letter I have.
10       **INMATE CASTANEDA:**  I just received this
11  one a couple of days ago through the
12  institutional mail.
13       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
14  (indiscernible)
15       **ATTORNEY SPOWART:**  He's got some pictures
16  here of his family.
17       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
18  That's great. Yes, because we'll be
19  (indiscernible). Thank you.
20       **DEPUTY DISTRICT ATTORNEY JACOBS:**  That
21  second letter, that was a job offer?
22       **PRESIDING COMMISSIONER ST. JULIEN:**  Yes,
23  and I'll read it at the appropriate time and if
24  you want to see it, I can pass it over. Since it
25  wasn't in our packet. Do you have any
26  preliminary objections?
27       **ATTORNEY SPOWART:**  I have none.

6

1          **PRESIDING COMMISSIONER ST. JULIEN:**  Will

2    Mr. Castaneda be speaking with us today?

3          **INMATE CASTANEDA:**  Yes, I'll be speaking

4    with you today.

5          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

6    You also have the right to be heard by a fair

7    and partial panel. Now that you've seen the

8    panel members here today, do you have any

9    objections?

10          **INMATE CASTANEDA:**  No, I don't.

11          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

12    Mr. Spowart?

13          **ATTORNEY SPOWART:**  No.

14          **PRESIDING COMMISSIONER ST. JULIEN:**  Is

15    there any confidential information?

16          **ATTORNEY SPOWART:**  No confidential

17    information.

18          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

19    I need to give you an officer. Do you solemnly

20    swear that the testimony you give today will be

21    the truth, the whole truth, and nothing but the

22    truth?

23          **INMATE CASTANEDA:**  Yes, I do.

24          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

25    thank you. I feel like I'm forgetting something.

26    Okay, I'll start by reading the – there's just a

27    very brief summary in the order report that I'm

7

1  looking at, February 2003 and your

2  (indiscernible) dates on October 8, 1990. Mr.

3  Castaneda apparently had a physical altercation

4  with the victim's brother, Jorge – was it

5  Carreon?

6          **INMATE CASTANEDA:**  It's Carreon.

7          **PRESIDING COMMISSIONER ST. JULIEN:**

8  Carreon. C-A-R-R-E-O-N. Over his ex-girlfriend.

9  The victim, Fidel Carreon intervened and broke

10  up the altercation. Mr. Castaneda was leaving

11  the location, he yelled out in Spanish, "El

12  vario esuzo" (phonetic) which means "I'll be

13  back".

14          **INMATE CASTANEDA:**  I don't speak good

15  Spanish.

16          **PRESIDING COMMISSIONER ST. JULIEN:**  Did

17  you say that? In Spanish?

18          **INMATE CASTANEDA:**  I can't recall if I

19  did.

20          **PRESIDING COMMISSIONER ST. JULIEN:**  On

21  October 9, 1990, at about 8:41 p.m., Castaneda

22  and unknown companions drove his vehicle to the

23  victim's residence, located at 500 Virginia

24  Avenue in the City of Isuza (phonetic).

25  Thereafter, witnesses observed Castaneda and his

26  companions to leave the vehicle and walk up to

27  the victim's house. Finding the victim outside,

8

1   Castenenda displayed a handgun and shot the
2   victim five times in the chest, groin and right
3   arm areas.  Castaneda and his companions then
4   fled the location. Now, is that an accurate
5   description of what happened? I know you have an
6   inmate's version in this court report as well.
7   Was that accurate, what I just read?
8         **INMATE CASTANEDA:**  All except that his
9   brother tried to break up the fight. His brother
10  also was helping – well, the two brothers – they
11  were both beating me up instead of one of them
12  trying to break it up.
13        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
14  so why don't you give us a brief overview of
15  what happened that night? I read your version
16  and it seems like it's very confusing. You're
17  running out of gas a couple of times – why don't
18  you tell us what happened.
19        **INMATE CASTANEDA:**  Well, the night that
20  the female-Gloria came over to my house –
21        **PRESIDING COMMISSIONER ST. JULIEN:**  Were
22  you dating?
23        **INMATE CASTANEDA:**  No, we were just both
24  going through a separation. She was going
25  through a divorce; I was separated from my wife.
26        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
27        **INMATE CASTANEDA:**  Who is now my ex-wife.

9

1    She came over with another friend who drove her
2    there. I had – it was a weekend, I had friends
3    over. We were – we were partying and she came
4    unannounced. She started a confrontation with
5    the female friend that was at my house.
6          **PRESIDING COMMISSIONER ST. JULIEN:**  Why
7    do you think that happened? Did she think it was
8    a girlfriend of yours or what?
9          **INMATE CASTANEDA:**  I, to tell you the
10   truth, I really don't know why – she was I guess
11   – came back from the clubs and she was already
12   intoxicated.
13         **PRESIDING COMMISSIONER ST. JULIEN:**  Was
14   she a little – okay.
15         **INMATE CASTANEDA:**  She started a
16   confrontation with the female friend that was
17   there at my house. Her – her ride left and she
18   had nowhere to – this was like 1:00 in the
19   morning. She asked if I could give her a ride,
20   because I told her to stop fighting with the
21   female, you know, to go. She indicated to me
22   that her driver had left. Her ride had left. Her
23   way of getting home, so if I could give her a
24   ride then I was glad to get her out of my house.
25   Well, on the way home – on the way to taking her
26   to whatever location she wanted to go, I
27   accidentally – well, not accidentally – I ran

10

1   out of gas.  So, not knowing where I was taking

2   her, after I dropped her off, when I left the

3   scene of the place I dropped her off, the

4   residence, I ran out of gas. I went back to the

5   location to ask for help to get some type of gas

6   can or gasoline to put back in my car so I could

7   get home. Well, one of the males came out and I

8   had a confrontation with him. I said, "All I

9   want to do is just get gas, get home, get out."

10          **PRESIDING COMMISSIONER ST. JULIEN**:  Had

11  you ever met this person before?

12          **INMATE CASTANEDA**:  Never met him before.

13  Well, next thing you know we started arguing. I

14  told him, "You know what? I'm leaving". He was

15  on the other side of the fence, he just jumped

16  over the fence and started a confrontation with

17  me and the next thing you know, we're fighting

18  and his brother jumped over the fence which was

19  no bigger than like three and a half, maybe four

20  feet high and started fighting with me also.

21  Once I got away, I started running towards the

22  opposite way. Trying to get home. Trying to get

23  back in a safe location. After awhile, about a

24  couple two or three minutes, shots were fired.

25  Now this is 2:00 in the morning. Early morning.

26  And I started zig-zagging, running through the

27  trees. Running through the dark areas. Running

11

1   through the alleys.

2        **PRESIDING COMMISSIONER ST. JULIEN:**  So,

3   were the shots fired at you?

4        **INMATE CASTANEDA:**  They were at me.

5        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

6        **INMATE CASTANEDA:**  I got away. I mean, I

7   know there's no paperwork on record indicating

8   that because I took a plea bargain on this and I

9   never had the opportunity to state it in court,

10  so I know it's my word against theirs. I

11  understand that. Once I got home I was beaten

12  up. Black eye, busted lip, my hands were

13  swollen. I was fighting these two individuals.

14  You know, I was mad. I understand.

15       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

16  so now had you been drinking as well?

17       **INMATE CASTANEDA:**  Well, after I got

18  home, yeah I started drinking.

19       **PRESIDING COMMISSIONER ST. JULIEN:**  No, I

20  mean before?

21       **INMATE CASTANEDA:**  Well, yeah. We had

22  just a little (indiscernible).

23       **PRESIDING COMMISSIONER ST. JULIEN:**  So,

24  would you consider yourself being intoxicated?

25       **INMATE CASTANEDA:**  No, because I was

26  having trying to control the people that were in

27  my house. It was -yeah.

12

1      **PRESIDING COMMISSIONER ST. JULIEN:**  And

2   would you consider - Do you have any indication

3   that the other people - The two people who beat

4   you up or were fighting with you - did they seem

5   impaired in anyway?

6      **INMATE CASTANEDA:**  No.

7      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

8   go ahead.

9      **INMATE CASTANEDA:**  And -

10     **PRESIDING COMMISSIONER ST. JULIEN:**  So

11  you get back to your house.

12     **INMATE CASTANEDA:**  I got back to my house

13  and I was still angry all night long. And, I

14  just vowed revenge on them, due to the fact what

15  they did. Well, later that evening, somebody

16  drove by and started throwing bottles at my

17  house. Well, that next morning or even that

18  evening, it was about 4:00, the sun started

19  coming out. I went outside; there was bottles,

20  broken bottle glass all over my yard area. No, I

21  didn't call the cops, which I should have. I

22  understand I should have called the authorities

23  and reported it. But, at the time I was just- I

24  was angry. I was not in the right mind. I was

25  just completely angry at him. I vowed revenge

26  and I would take care of it in my own way and I

27  was wrong for doing that.

13

1          **PRESIDING COMMISSIONER ST. JULIEN:** Okay,

2    so then how do you make your way back to this?

3          **INMATE CASTANEDA:** After I started - I

4    got back in my car and -

5          **PRESIDING COMMISSIONER ST. JULIEN:** About

6    what time was this?

7          **INMATE CASTANEDA:** Well, this was later

8    on that evening. I didn't go nowhere until that

9    evening.

10          **PRESIDING COMMISSIONER ST. JULIEN:** Okay,

11    so all the- all the- the altercation and driving

12    Gloria home and all this was like in the middle

13    of the night?

14          **INMATE CASTANEDA:** Yeah.

15          **PRESIDING COMMISSIONER ST. JULIEN:** And

16    then you get home and you start drinking and

17    you're stewing, you're mad, whatever. So you're

18    home all that next day?

19          **INMATE CASTANEDA:** I'm home - I was home

20    all the next day.

21          **PRESIDING COMMISSIONER ST. JULIEN:** Okay

22    and then what -- So then?

23          **INMATE CASTANEDA:** It wasn't until the

24    evening time when I started planning it - doing,

25    you know - trying to plan my revenge on the two

26    individuals that, you know, I had fought with

27    and had shot at me.

14

1          **PRESIDING COMMISSIONER ST. JULIEN**:  Okay.

2          **INMATE CASTANEDA**:  After leaving to go

3   put gas in my car, I ran out of gas again.

4   Because I only had enough gas in my gas can that

5   was for my lawn mower that I put in there. Just

6   to get me to a gas station. Well, it ended up

7   not being enough. I ran out of gas and I was

8   pushing the car again to the gas station. Well,

9   apparently I guess they seen me. They indicated

10  in the police report they seen me pushing the

11  car to the gas station later on that evening. It

12  was about 7:00 o'clock in the evening and after

13  that I went by and I was already still mad and

14  angry. You know, I was -

15          **PRESIDING COMMISSIONER ST. JULIEN**:  So,

16  who were you with? Were you with anybody?

17          **INMATE CASTANEDA**:  I was with two

18  occupants, yeah.

19          **PRESIDING COMMISSIONER ST. JULIEN**:  And

20  now, did these people - are they unnamed?

21          **INMATE CASTANEDA**:  No, I named them last

22  time. It's in the report.

23          **PRESIDING COMMISSIONER ST. JULIEN**:  Now,

24  okay, you were with two friends and did you all

25  have guns or what?

26          **INMATE CASTANEDA**:  No, it was some throw

27  away that somebody had picked up.

15

1          **PRESIDING COMMISSIONER ST. JULIEN:**  But

2    it was a gun?

3          **INMATE CASTANEDA:**  It was a gun, yeah.

4          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

5    so you planned to go back and did you plan on

6    shooting both of these assailants or did you

7    plan on shooting one or what was your plan?

8          **INMATE CASTANEDA:**  Well, I didn't have no

9    plans really, as far as to really do anything

10   but once we started getting in a heated

11   conversation, I just was asking why they did

12   what they did. All I wanted was to get gas to

13   get home. Why did they start shooting at me? It

14   was his brother that I was talking to. Not the

15   one that initially started the confrontation

16   with me and I was just so angry, that I just

17   said, "You know what, I got a message to give to

18   you to give to your brother and do what you

19   gotta do". I just fired at him, then I left the

20   scene.

21         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

22   Now, why did initially you refuse to give the

23   names?

24         **INMATE CASTANEDA:**  Well, because I take

25   full responsibility for what happened.

26         **PRESIDING COMMISSIONER ST. JULIEN:**  So,

27   how much of this is gang related?

16

1          **INMATE CASTANEDA:**  None. It was just-
2          **PRESIDING COMMISSIONER ST. JULIEN:**  Were
3   you in a gang?
4          **INMATE CASTANEDA:**  No, I wasn't in a
5   gang.
6          **PRESIDING COMMISSIONER ST. JULIEN:**  Oh?
7          **INMATE CASTANEDA:**  No.
8          **DEPUTY DISTRICT ATTORNEY JACOBS:**
9   (indiscernible) an associate?
10         **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah,
11  I have in my notes that you were somehow
12  involved in a gang.
13         **INMATE CASTANEDA:**  No, it's just - I
14  lived around - in the area. You know, I went to
15  school with them, you know. Other than that,
16  being -
17         **PRESIDING COMMISSIONER ST. JULIEN:**  Isuza
18  (phonetic)13.
19         **INMATE CASTANEDA:**  Other than that, I'm
20  not an associate. I'm not involved in no gangs.
21         **PRESIDING COMMISSIONER ST. JULIEN:**  So,
22  you were never an associate of a gang on the
23  street or in prison?
24         **INMATE CASTANEDA:**  No.
25         **PRESIDING COMMISSIONER ST. JULIEN:**  Well.
26         **INMATE CASTANEDA:** I grew up-
27         **PRESIDING COMMISSIONER ST. JULIEN:**  My

17

1  colleague might have some other information.

2  Okay.

3        **INMATE CASTANEDA:**  (Indiscernible) I can

4  explain that. When the counselor wrote that, he

5  misinterpreted what I was telling him.

6        **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah,

7  but it's not what you said.

8        **INMATE CASTANEDA:**  What's that?

9        **PRESIDING COMMISSIONER ST. JULIEN:**  It's

10  what other people have said about you.

11        **INMATE CASTANEDA:**  Yeah, well what the

12  counselor wrote back in what year was that?

13        **PRESIDING COMMISSIONER ST. JULIEN:**  '91

14        **INMATE CASTANEDA:**  2003. Oh no, she said

15        **PRESIDING COMMISSIONER ST. JULIEN:**  No,

16  I'm saying there's a memo dated 8-12-91

17  documenting street gang association Isuza

18  (phonetic) 13.

19        **INMATE CASTANEDA:**  '91.

20        **PRESIDING COMMISSIONER ST. JULIEN:**  And

21  then also there's some - going to the

22  (indiscernible) going to the personal factors.

23  He was a member of the Serrano (phonetic) Isuza

24  (phonetic) 13 gang at the time.  Did you talk

25  about this at your last hearing?

26        **INMATE CASTANEDA:**  No, I didn't.

27        **PRESIDING COMMISSIONER ST. JULIEN:**

18

1  Nobody's mentioned this to you?

2      **INMATE CASTANEDA:**  No. I remember the

3  report that the counselor wrote and he

4  misinterpreted what he was getting from me. When

5  he asked me what part of the State of California

6  I was from, I told him I was from the southern

7  part. He goes, "Well, what part?" Los Angeles

8  County area, San Gabriel Valley. I was born and

9  raised in the City of (indiscernible) and he

10  said, "Well, okay" and then out of all his

11  notes, he conjured all that up.

12      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

13  so now - did you, subsequently when you saw

14  this, did you subsequently -

15      **INMATE CASTANEDA:**  I filed an appeal on

16  it.

17      **PRESIDING COMMISSIONER ST. JULIEN:**  What

18  happened?

19      **INMATE CASTANEDA:**  I never received any

20  type of response.

21      **PRESIDING COMMISSIONER ST. JULIEN:**  Well,

22  we'll see what else we can find in her because

23  I'm sure you understand that that's an issue of

24  concern.

25      **INMATE CASTANEDA:**  Oh, I understand,

26  yeah.

27      **PRESIDING COMMISSIONER ST. JULIEN:**  And

19

1  that either way, it should be addressed or

2  resolved. Because I can guarantee you that this

3  type of thing in your files does not do you any

4  good. Okay?

5      INMATE CASTANEDA:  Yeah.

6      DEPUTY COMMISSIONER MEJIA:  When did you

7  file an appeal on that?

8      INMATE CASTANEDA:  That was back in '93

9  when I read the report.

10      PRESIDING COMMISSIONER ST. JULIEN:  You

11  mean 2003?

12      INMATE CASTANEDA:  Oh, 2003.

13      DEPUTY COMMISSIONER MEJIA:  2003.

14      PRESIDING COMMISSIONER ST. JULIEN:  Okay,

15  well, while we're looking for that, I'll just go

16  on. Okay, so now you file seven shots. Mr.

17  Carreon is hit. Doesn't die. But he sure is hit.

18  I'm surprised he didn't die. Why would you fire

19  seven times? You obviously wanted to - you want

20  to kill him?

21      INMATE CASTANEDA:  No, I didn't want to

22  kill him.

23      PRESIDING COMMISSIONER ST. JULIEN:  Well,

24  why did you shoot - shoot seven times? That's a

25  whole lot of times. So you basically emptied the

26  gun. How many rounds did the gun have?

27      INMATE CASTANEDA:  (Indiscernible)only

20

1  seven.

2        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

3  so you emptied the gun.

4        **INMATE CASTANEDA:**  Yeah.

5        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

6  so what's going on? What are you thinking?

7        **INMATE CASTANEDA:**  I wasn't.

8        **PRESIDING COMMISSIONER ST. JULIEN:**  Are

9  you impaired?

10       **INMATE CASTANEDA:**  No.

11       **PRESIDING COMMISSIONER ST. JULIEN:**  So no

12  alcohol or drugs?

13       **INMATE CASTANEDA:**  No.

14       **PRESIDING COMMISSIONER ST. JULIEN:**  So,

15  you're just mad as hell.

16       **INMATE CASTANEDA:**  I was mad, yes.

17       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

18       **INMATE CASTANEDA:**  Exactly.

19       **PRESIDING COMMISSIONER ST. JULIEN:**  So

20  now had anybody ever done anything like this to

21  you before?

22       **INMATE CASTANEDA:**  No.

23       **PRESIDING COMMISSIONER ST. JULIEN:**  How

24  old were you?

25       **INMATE CASTANEDA:**  I was in my late

26  twenties.

27       **DEPUTY COMMISSIONER MEJIA:**  28.

21

1          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
2    so you're not (indiscernible) now, okay. But you
3    know you're that age - you think you're - it's
4    not - you should have known better, definitely.
5          **INMATE CASTANEDA:**  Exactly. True.
6          **PRESIDING COMMISSIONER ST. JULIEN:**  So,
7    you don't have age as an excuse. You weren't
8    drunk. I really find it hard to believe that
9    throughout your 28 years, nobody had insulted
10   you or angered you to that degree. You know,
11   what I'm trying to get at is -
12         **INMATE CASTANEDA:**  I understand.
13         **PRESIDING COMMISSIONER ST. JULIEN:**  What
14   made this situation so bad? What made what these
15   people did so bad that you felt you had to
16   retaliate in such an extreme way. And I think at
17   this point in time, at least you would agree
18   that it was extreme.
19         **INMATE CASTANEDA:**  Yeah.
20         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
21   So what made you want to -
22         **INMATE CASTANEDA:**  Well, when they came
23   by and threw bottles at my house and shot at me
24   when I was leaving. When all I wanted to do was
25   to get gas and get out of there.
26         **PRESIDING COMMISSIONER ST. JULIEN:**  Did
27   you know who these people were? Did you know if

22

1  they were gang members? I mean wouldn't you be

2  afraid that - let's say if they were big gang

3  members and you go shooting them, then

4  somebody's going to retaliate on you?

5      **INMATE CASTANEDA:**  That's probably true.

6  Yeah.

7      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

8  so you're going to go shoot up people you don't

9  even know. Does that make any sense?

10      **INMATE CASTANEDA:**  No it don't. I was

11  wrong. Like I said, I accept -

12      **PRESIDING COMMISSIONER ST. JULIEN:**  So

13  whatever happens to - is it Gloria? Gloria. So

14  did she actually live there?

15      **INMATE CASTANEDA:**  I don't know, I think

16  it was just somebody - she said it was her

17  cousin's. I don't know if that was true or not.

18  She asked me to drop her off and she took me to

19  the location to drop her off. I dropped her off

20  and I left.

21      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

22  so since I'm having such a hard time

23  understanding motivation for this crime, perhaps

24  you can give me an idea, you know, what your

25  life was like. What kind of reactions - you

26  know, were you a violent guy? Were you a bully?

27  Were you fighting people?

23

1          **INMATE CASTANEDA:**  No, I wasn't.

2          **PRESIDING COMMISSIONER ST. JULIEN:**  Were

3    you picking on people?

4          **INMATE CASTANEDA:**  I was working. I was

5    going through a -

6          **PRESIDING COMMISSIONER ST. JULIEN:**  Were

7    you separated?

8          **INMATE CASTANEDA:**  A separation from my

9    wife.

10         **PRESIDING COMMISSIONER ST. JULIEN:**  Any

11   kids?

12         **INMATE CASTANEDA:**  Yes, I had three kids.

13   One on the way. We were separated. We were going

14   through some hard times. She ended up messing

15   around with somebody else.

16         **PRESIDING COMMISSIONER ST. JULIEN:**

17   During the separation or before?

18         **INMATE CASTANEDA:**  Before. Before the

19   separation. That's what got us separated. I just

20   started messing around with the wrong people.

21         **PRESIDING COMMISSIONER ST. JULIEN:**  Were

22   you - what kind of - how would you describe your

23   alcohol use?

24         **INMATE CASTANEDA:**  Just like go to work.

25   Come back, you know, have a couple drinks, clean

26   around the house.

27         **PRESIDING COMMISSIONER ST. JULIEN:**  Was

24

1  anything - was heavy drinking a habit?

2        **INMATE CASTANEDA**:  No.

3        **PRESIDING COMMISSIONER ST. JULIEN**:  What

4  about drug use?

5        **INMATE CASTANEDA**:  No, no drug - heavy

6  drug use. I smoked marijuana once in awhile but

7  not everyday. You know, I was working. Had a

8  job. Had a lot of jobs.

9        **PRESIDING COMMISSIONER ST. JULIEN**:  Okay,

10  so you're basically saying that this encounter

11  with these two individuals made you so mad that

12  you wanted to go back and shoot (indiscernible)

13  what you did?

14        **INMATE CASTANEDA**:  Yeah.

15        **PRESIDING COMMISSIONER ST. JULIEN**:  Okay,

16  and this - you've never had this kind of

17  reaction before, so what was it about this

18  night? These people, this instance that really

19  set you off? So much so that you didn't - you

20  didn't do what you said you should have done and

21  all that. What was it about it?

22        **INMATE CASTANEDA**:  It was just - I was

23  just very very mad at them. For trying to shoot

24  me. They shot at me - they, you know, got in a

25  fight. It was just over trying to get gas and

26  get home.

27        **PRESIDING COMMISSIONER ST. JULIEN**:  Okay,

25

1  so as we term that, very trivial. Okay, now what

2  about the friends that you took? Why do you

3  think they were willing to become involved?

4      **INMATE CASTANEDA:**  Well, they didn't know

5  about it.

6      **PRESIDING COMMISSIONER ST. JULIEN:**  So

7  they didn't know what you (indiscernible)?

8      **INMATE CASTANEDA:**  No. They didn't know

9  what I had planned.

10      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

11  so - how long - do you know how long, assuming

12  Mr. Carreon went to the hospital -

13      **INMATE CASTANEDA:**  Yeah, I understand he

14  spent about three days in the hospital.

15      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

16  So let's - we touched a little bit on your

17  personal - let's talk about that a little bit

18  more. So, you have your parents, are still

19  married?

20      **INMATE CASTANEDA:**  They're still married.

21  As a matter of fact, they'll have their 50th

22  anniversary next February.

23      **PRESIDING COMMISSIONER ST. JULIEN:**  Oh,

24  okay. And you have four brothers?

25      **INMATE CASTANEDA:**  Yes, I do.

26      **PRESIDING COMMISSIONER ST. JULIEN:**  All

27  boys?

26

1        **INMATE CASTANEDA:**  All boys.

2        **PRESIDING COMMISSIONER ST. JULIEN:**  Your

3   poor mother. Okay. And you have four kids, as

4   you said. And, can you just give us a little

5   overview of what your brothers are doing and

6   what your children are doing?

7        **INMATE CASTANEDA:**  Well, my children - my

8   oldest boy, he's working three jobs right now.

9        **PRESIDING COMMISSIONER ST. JULIEN:**  How

10   old is he?

11        **INMATE CASTANEDA:**  He's 23 years old now.

12   I handed you some pictures.

13        **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah,

14   I'm looking at them right now. And you're in

15   touch?

16        **INMATE CASTANEDA:**  Yeah, I'm in touch

17   with all of them.

18        **PRESIDING COMMISSIONER ST. JULIEN:**  Had

19   you ever lost touch?

20        **INMATE CASTANEDA:**  No, I haven't.

21        **PRESIDING COMMISSIONER ST. JULIEN:**  So

22   you have -

23        **INMATE CASTANEDA:**  I have four children.

24        **PRESIDING COMMISSIONER ST. JULIEN:**  One

25   boy?

26        **INMATE CASTANEDA:**  Two boys and two

27   girls. And that's my only grandson.

27

1          **PRESIDING COMMISSIONER ST. JULIEN:**  Oh, I
2    see.

3          **INMATE CASTANEDA:**  That's just them when
4    they were younger.

5          **PRESIDING COMMISSIONER ST. JULIEN:**  Oh
6    wow. So your son has three jobs. Why does he
7    have three jobs?

8          **INMATE CASTANEDA:**  He's single. He's got
9    three jobs. He's got a car payment.

10          **PRESIDING COMMISSIONER ST. JULIEN:**  Tell
11    him he should be a correctional officer. It's a
12    good career. I'm serious, it's a good career.

13          **INMATE CASTANEDA:**  He's trying to get
14    into rapping.

15          **PRESIDING COMMISSIONER ST. JULIEN:**  No,
16    tell him -

17          **INMATE CASTANEDA:**  Yeah, he's been doing
18    that since he was young.

19          **PRESIDING COMMISSIONER ST. JULIEN:**  Tell
20    him he can do that in his spare time. He needs
21    to get a good job.

22          **INMATE CASTANEDA:**  My other son, he's got
23    another job. He's working through a temporary
24    agency. My daughter, she's working for a
25    restaurant. She's a hostess. My youngest
26    daughter, she's in 10th grade.

27          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

28

1  so very good. So you have good relationships
2  with them?
3        **INMATE CASTANEDA:**  Yes.
4        **PRESIDING COMMISSIONER ST. JULIEN:**  And
5  your parents as well. Now is your father in the
6  military?
7        **INMATE CASTANEDA:**  Yes, he is. Well no,
8  he's a vet. His company or his outfit is
9  (indiscernible). What they do is they march in
10 parades to honor our veterans. They honor them
11 by burials. I got some newspaper clippings.
12       **PRESIDING COMMISSIONER ST. JULIEN:**  I bet
13 they're busy these days.
14       **INMATE CASTANEDA:**  Yeah, they -
15       **PRESIDING COMMISSIONER ST. JULIEN:**  He
16 was in the military?
17       **INMATE CASTANEDA:**  Yeah. First 101
18 Airborne Division.
19       **PRESIDING COMMISSIONER ST. JULIEN:**  Were
20 you ever in the military?
21       **INMATE CASTANEDA:**  No, I was never in the
22 military.
23       **PRESIDING COMMISSIONER ST. JULIEN:**  Well,
24 why not? I'm sure he would have -
25       **INMATE CASTANEDA:**  I tried to get in when
26 I was 17 - tried to get in when I was 17 -- it's
27 just, my father wouldn't sign for me to go to

29

1   the military. He wanted me to go ahead and

2   finish my schooling first and - I wish he would

3   have -

4           **PRESIDING COMMISSIONER ST. JULIEN:**  Any

5   other of your other brothers?

6           **INMATE CASTANEDA:**  No, they never had any

7   -

8           **PRESIDING COMMISSIONER ST. JULIEN:**

9   That's unusual.

10          **INMATE CASTANEDA:**  Yeah.

11          **PRESIDING COMMISSIONER ST. JULIEN:**  Maybe

12  they just got turned off. Okay, so what are your

13  other brothers doing?

14          **INMATE CASTANEDA:**  Working.

15          **PRESIDING COMMISSIONER ST. JULIEN:**  So

16  are you the only one that has -

17          **INMATE CASTANEDA:**  I'm the only one. Yes.

18          **PRESIDING COMMISSIONER ST. JULIEN:**  So

19  what was the family's reaction?

20          **INMATE CASTANEDA:**  They were devastated.

21  They were - I hurt them bad.

22          **PRESIDING COMMISSIONER ST. JULIEN:**  How

23  did you explain this to your brothers, when it

24  happened?

25          **INMATE CASTANEDA:**  (Indiscernible) and

26  hopefully she would understand that - you know -

27  - what I was going through bad times. There was

30

1  really nobody for me to lean on at the time,
2  besides wrong - the wrong people.
3      **PRESIDING COMMISSIONER ST. JULIEN:**  And
4  where are you in the order of your brothers?
5      **INMATE CASTANEDA:**  I'm the fourth one and
6  have a younger brother. My two older brothers,
7  they're twins and then I have one that's
8  younger, then there's me and my youngest
9  brother.
10      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
11  so how do you feel this impacted your children's
12  lives?
13      **INMATE CASTANEDA:**  Well, by looking at
14  them pictures, it impacted them very bad.
15  They've been without a father for the last
16  fifteen years. All because of my (indiscernible)
17  and they've been through a lot. I hear them,
18  talk to them, write to them. Right now, my
19  daughters are trying to figure out why I'm not
20  home with them when I keep telling them - trying
21  to explain to them - right now, it's just - my
22  daughters especially, they distance themselves
23  because they think I'm giving them false hope. I
24  try to explain to them that I'm trying to do -
25  I've done everything the best I can with what
26  programs are in here to learn multiple skills.
27  Operate a $100,000.00 machine for the PIA

31

1  Industries. I've got job offers. Got newspaper -
2  - my father got me a subscription to the San
3  Gabriel Tribute for the classified ads. I've
4  applied to a lot of the classified ads for C & C
5  operator. Hopefully - I'm giving them false
6  hope.
7         **PRESIDING COMMISSIONER ST. JULIEN:**  Well,
8  there's a lot involved in this whole process.
9         **INMATE CASTANEDA:**  Yeah, I understand.
10        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
11 There were some - a couple of statements that
12 concerned me when I read your probation
13 officer's report. Now in that, it's under Gang
14 Activity, it says you have slight ties with
15 these Isuza (phonetic) 13 gangs. So maybe that's
16 where some of this other stuff comes -
17        **INMATE CASTANEDA:**  I went to school with,
18 you know, in the neighborhood.
19        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
20 so let me go over these things that - I don't
21 know if you went over them before or not, but
22 they're concerning - if they're concerning to
23 me, I think they'll be concerning to others.
24 Now, it says you show no regret or remorse for
25 your actions and that you said that you'd do the
26 same thing again. Indicated to the investigative
27 detectives that you would (indiscernible) the

32

1  act again, given the same circumstances, only

2  using a bigger gun. This clearly shows that the

3  defendant, at the time has no remorse or concern

4  for the victim or his (indiscernible). So how do

5  you - is that an accurate description of what

6  you said at the time?

7         **INMATE CASTANEDA:**  That was at the time

8  of the investigation, which - yeah -

9         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

10  so now, someone like me - reading this, what do

11  you think I thought when I read that?

12         **INMATE CASTANEDA:**  I understand. Like I

13  said, I wouldn't want to have you guy's job in

14  determining -

15         **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah,

16  but I'm just thinking - okay, so you aren't

17  remorseful -

18         **INMATE CASTANEDA:**  Well, at the time, no.

19         **PRESIDING COMMISSIONER ST. JULIEN:**  You

20  just said you would use a bigger gun. Okay, so

21  that indicates, okay well, he wished he killed

22  this guy.

23         **INMATE CASTANEDA:**  Yeah, at the time. I

24  understand.

25         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

26  so now why would somebody who felt this strongly

27  about what he did and that he was in the right,

33

1  how does - how long has it been?

2        **INMATE CASTANEDA:**  15 years.

3        **PRESIDING COMMISSIONER ST. JULIEN:**  15

4  years, okay.

5        **INMATE CASTANEDA:**  March 21st of this

6  month.

7        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

8  so how does 15 years change - really this

9  extreme disregard for the -

10        **INMATE CASTANEDA:**  I understand, I almost

11  took a human's life and that was wrong for me.

12        **PRESIDING COMMISSIONER ST. JULIEN:**  And

13  you wanted to. Okay, so how do we deal with that

14  today?

15        **INMATE CASTANEDA:**  Well, all I'm trying

16  to do is look forward and put that behind me. I

17  can't change what I did. I can only better it

18  and think positive about what I did.

19        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

20  you can't change it. But we're here today

21  because of what you did.

22        **INMATE CASTANEDA:**  Exactly.

23        **PRESIDING COMMISSIONER ST. JULIEN:**  So,

24  you have to address this.

25        **INMATE CASTANEDA:**  Well, like I said, I

26  was wrong. At that time, I was angry. I was

27  immature, even though I was at the age of 27.

34

1  I'm 43, going on 44. I've matured and thought a
2  lot about it. I'm sorry. I apologize. I only
3  wish to move forward.
4        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
5  so you are out on parole pretty much in the same
6  area, geographically. I have no idea where these
7  guys are. Let's say they want revenge on you.
8        **INMATE CASTANEDA:**  The only thing -
9        **PRESIDING COMMISSIONER ST. JULIEN:**  Or
10  their kids want revenge on you for something.
11  So, they're throwing bottles and rocks and stuff
12  at your car or house, what do you do?
13        **INMATE CASTANEDA:**  Call the authorities,
14  like I was supposed to do in the first place.
15        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
16  you are working - something goes wrong, and you
17  get fired for something you did do, you didn't
18  do, whatever. You're down on your luck again.
19  People are not as supportive as you should be,
20  what do you do? How do you handle that?
21        **INMATE CASTANEDA:**  There are other
22  resources. I could go to the Unemployment
23  Office.
24        **PRESIDING COMMISSIONER ST. JULIEN:**  How
25  do you emotionally handle the frustrations, the
26  rejections? The negative aspects of life on the
27  outside? What's in you today that can let you

35

1  handle those things?

2      **INMATE CASTANEDA:**  There's hope that

3  there are solutions to stressful situations in

4  life. There are better ways to handle them -

5  positive ways, not negative ways.

6      **PRESIDING COMMISSIONER ST. JULIEN:**  Do

7  you take a drink?

8      **INMATE CASTANEDA:**  No, that's not the

9  problem - that's not the solution to the

10 problem. That's only asking for more problems.

11 That impairs a person's judgment - I understand

12 that. I understand that completely. I vowed

13 never to use any type of alcohol or controlled

14 substance unless under doctor supervision and I

15 truly mean that from the bottom of my heart. I

16 will not ever touch another drink of alcohol.

17     **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

18 well we'll move onto your support and opposition

19 letters. I don't have any opposition. I do have

20 - the Board sends out 3042 notices which are

21 notices that go to law enforcement, the courts

22 and others that have an interest in your case.

23 We do, of course, have the District Attorney

24 from Los Angeles County here. I don't have any

25 words or correspondence. We do have a support

26 letter from your parents. Mr. and Mrs.

27 Castaneda. They still live in Isuza. And they're

36

1    saying that, "As the Father and Mother, we will

2    support" - they will support you in every way

3    possible. This includes housing and food. And,

4    they want to let you know - they want to let us

5    know that they will involve you in the community

6    as well. They made - they give an outline of

7    your accomplishments here and they say that

8    they've saved money and will purchase tools that

9    will help you start your new direction and that

10   you have (indiscernible) the inside into

11   yourself and your ability to make positive

12   decisions and they're also involved in the

13   church and (indiscernible) that you will be,

14   too. And, that it's very important for you to be

15   with your family, okay? And then we have a

16   letter from Castro Electric in Isuza (phonetic)

17   and it's William Castro and the letter says

18   that, first of all, they're hoping for you to

19   get paroled. They've known you - or he's known

20   you for over twenty years and he knows your

21   parents. I guess the families - two families

22   know each other?

23          **INMATE CASTANEDA:**  Yes.

24          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

25   and he says, "In 1990 I started my own

26   contracting company. I'm an electrical

27   contractor. Before I started my business, Martin

37

1  used to help me on side jobs. He was a very

2  good, hard worker. Very respectable to

3  customers, even though you had another job, you

4  did work for extra money to help your family".

5  He says, "I know Martin will be closely

6  monitored by his parole officer and if he's

7  released, I will keep his parole officer

8  completely informed of his progress". And that,

9  Mr. Castro gives a lot - a few of his

10 accomplishments as well and his community

11 activities with the Little League and I think

12 with the - he's also - and is electronics your

13 trade?

14      **INMATE CASTANEDA**:  No.

15      **PRESIDING COMMISSIONER ST. JULIEN**:  Do

16 you know how to do the work?

17      **INMATE CASTANEDA**:  Yeah, I know how to do

18 the work. I used to work for him - just a

19 neighbor. He'd teach me his trade.

20      **PRESIDING COMMISSIONER ST. JULIEN**:  I

21 forgot to mention your prior criminal record.

22 Don't have too many juvenile offenses. As an

23 adult, however, it looks like you had two

24 probation terms. Receiving Stolen Property and

25 Possession of a Dangerous Weapon in the '80's.

26 Had you ever been to jail or prison before?

27      **INMATE CASTANEDA**:  No, this is my first

38

1  time.

2    **PRESIDING COMMISSIONER ST. JULIEN**:  Okay.

3  So you would live with your parents and then you

4  would work with Mr. Castro?

5    **INMATE CASTANEDA**:  No. Well, what I would

6  do is look for a job as a C&C operator. Do what

7  the trade that I'm currently working right now.

8  Through the PIA. They have a job placement

9  program. That's why my father got me the

10  subscription to the newspaper and there's a lot

11  of classified ads and they are looking for C&C

12  operators – within the respective area that I'd

13  be living in my parents' house.

14    **PRESIDING COMMISSIONER ST. JULIEN**:  Okay.

15  Commissioner Mejia, would you like to proceed

16  with post conviction?

17    **DEPUTY COMMISSIONER MEJIA**:  Yes, Mr.

18  Castaneda, I'll be (indiscernible) this portion

19  of this hearing since your last court

20  appearance. I have reviewed the Central File and

21  Board reports and have the - your last

22  appearance was on August 28, 2003, wherein you

23  received a two year denial. The recommendations

24  for you remains in our (indiscernible)

25  participate in self-help, (indiscernible)

26  classifications 19 (indiscernible), PIA as a

27  machine operator. Above average, exceptional,

39

1  excellent work report. (indiscernible) '93. 4.9

2  GPL, Completed Upholstery in 1996. You have a

3  Certificate of Efficiency PIA furniture shop

4  operator, you have AA in 1994, the last

5  (indiscernible) I've seen I 1999. One and one,

6  1997 in (indiscernible) therapy. One anger

7  management, 2002. And three-hour (indiscernible)

8  2003. Did you do anything between August 28,

9  2003 to present when it comes to self-help?

10      **INMATE CASTANEDA:**  Yes, I have a

11  certificate of completion here through Muslim

12  Services. Anger Management and Fatherhood.

13      **DEPUTY COMMISSIONER MEJIA:**  It's not in

14  your file yet, so be sure it gets in there.

15  Anger Management course - 12 week Anger

16  Management course with the Muslim Chapel

17  10/1/05. And Fatherhood - that's the same thing,

18  right?

19      **INMATE CASTANEDA:**  Yeah, their both the

20  same - it was the whole complete thing.

21      **DEPUTY COMMISSIONER MEJIA:**  Have you done

22  any AA?

23      **INMATE CASTANEDA:**  No, I haven't.

24      **DEPUTY COMMISSIONER MEJIA:**  Why? The last

25  one is 1990, so that's a -

26      **INMATE CASTANEDA:**  Last one was back in

27  1999.

40

1      **DEPUTY COMMISSIONER MEJIA:**  And why did

2   you stop going to AA – NA/AA?

3      **INMATE CASTANEDA:**  I think I benefited

4   and got what I could out of those – that

5   program. Made a conscious decision never to use

6   any type of drug or alcohol. I've learned my

7   lesson.

8      **DEPUTY COMMISSIONER MEJIA:**  To be honest

9   with you, your chronos in your file about your

10  AA attendance is sporadic. From 1994 to 1999.

11  You know, it's not (indiscernible) when it comes

12  to the court. I'm not saying you haven't been

13  attending, but the chronos or documentation

14  showed that you had been attending consistently

15  from 1994 to 1999 and it's not here in the file.

16  I see sporadic –

17     **INMATE CASTANEDA:**  The last one I

18  attended in '99.

19     **DEPUTY COMMISSIONER MEJIA:**  What have you

20  learned in AA or NA?

21     **INMATE CASTANEDA:**  I learned that –

22     **DEPUTY COMMISSIONER MEJIA:**  Do you know

23  the twelve steps? Let's go straight to the

24  question – twelve steps. And you thought that

25  you didn't need it anymore.

26     **INMATE CASTANEDA:**  To admit when I was

27  wrong. That alcohol does have an effect on you

41

1  when – when I was wrong.

2      **DEPUTY COMMISSIONER MEJIA:**  I'll help you

3  out. What is step one?

4      **INMATE CASTANEDA:**  To admit that I was

5  powerless over alcohol.

6      **DEPUTY COMMISSIONER MEJIA:**  Okay, that's

7  one. Let's go to step two.

8      **INMATE CASTANEDA:**  Two, came to believe

9  that a power that was greater than myself could

10  restore me to sanity.

11      **DEPUTY COMMISSIONER MEJIA:**  Okay, three?

12      **INMATE CASTANEDA:**  I think it's made a

13  decision to turn my life over to a higher God

14  but –

15      **DEPUTY COMMISSIONER MEJIA:**  Good. You're

16  doing good. Four?  I don't expect you to know

17  it.

18      **INMATE CASTANEDA:**  Like I said, it's

19  been-

20      **DEPUTY COMMISSIONER MEJIA:**  What

21  benefited you most on these twelve steps that's

22  made you feel that you don't need it anymore?

23      **INMATE CASTANEDA:**  To take a personal

24  inventory – a moral inventory of myself and when

25  I was wrong, promptly admit it.

26      **DEPUTY COMMISSIONER MEJIA:**  Are you –

27  have you already talked to (indiscernible)and

42

1  part of your commitment and trust was because

2  you used alcohol - you were using alcohol at the

3  time?

4      **INMATE CASTANEDA**:  Yes.

5      **DEPUTY COMMISSIONER MEJIA**:  If you didn't

6  use alcohol, maybe you'd have a better -

7      **INMATE CASTANEDA**:  I would have had

8  better judgment, exactly.

9      **DEPUTY COMMISSIONER MEJIA**:  How would you

10  remain alcohol free in the community if you

11  stopped doing it here?

12      **INMATE CASTANEDA**:  One day at a time.

13      **DEPUTY COMMISSIONER MEJIA**:  Do you see my

14  point though?

15      **INMATE CASTANEDA**:  I understand.

16      **DEPUTY COMMISSIONER MEJIA**:  If you

17  stopped doing it here, what is your plan to

18  remain alcohol free in the community when we

19  release you?

20      **INMATE CASTANEDA**:  Well, knowing that

21  people in society - when they go to these

22  programs, they want to benefit from - where I'm

23  around people who go just for the chrono for the

24  satis -

25      **DEPUTY COMMISSIONER MEJIA**:  We're on side

26  B of this tape - go ahead.

27      **INMATE CASTANEDA**:  I know I'd be around

43

1  other citizens who - where I could find a

2  sponsor within the group to help me whenever I -

3  if I ever had the urge to drink, which, like I

4  stated before, I would never touch the stuff

5  ever again.

6      **DEPUTY COMMISSIONER MEJIA:**  There's -

7  you've been away from the program for about what

8  -seven years now. And that is why we have always

9  recommend people to attend that at such a time

10 that they consistently (indiscernible) some

11 sponsor (indiscernible) enable them to - and

12 also make the - able to have some information on

13 how they ended up in the streets.

14     **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

15 let's take a minute. Because I know you filed a

16 writ and one of the points in the writ was

17 attending AA.

18     **INMATE CASTANEDA:**  Right.

19     **PRESIDING COMMISSIONER ST. JULIEN:**  So I

20 want to make it clear that it is not that we are

21 saying you have to go to AA --- attend AA. Any

22 twelve-step program and I understand completely

23 your point. I hear this time and time again that

24 sometimes AA isn't much benefit to people here

25 because of the other people going just for the

26 sake of going, or whatever. But, the reason why

27 we usually say AA because it's - like the

44

1  Commissioner was saying, it's what's out there.
2  You know, it's big. You can go anywhere and get
3  an AA meeting, or whatever. But, if you can do a
4  twelve-step program on your own, that's great.
5  But, you do have to have some kind of relapse
6  prevention program in your life.
7      **INMATE CASTANEDA:**  Exactly. And, like I
8  said -
9      **PRESIDING COMMISSIONER ST. JULIEN:**  I'm
10  sorry - I just wanted to add that. Since it was
11  an issue before.
12      **DEPUTY COMMISSIONER MEJIA:**  Well, we -
13  it's an issue. What did the court say about
14  that? (indiscernible) we are not -
15      **PRESIDING COMMISSIONER ST. JULIEN:**  No,
16  we can't mandate you go to AA but we can, for
17  your own good -
18      **DEPUTY COMMISSIONER MEJIA:**  We are not
19  basing our decision just on the self-help. We
20  have a big picture.
21      **PRESIDING COMMISSIONER ST. JULIEN:**
22  Right. No, that's what I'm saying, that AA was -
23  -
24      **DEPUTY COMMISSIONER MEJIA:**  But, I'm
25  trying to give you some reasoning why we expect
26  people to go to structured meetings for self-
27  help like NA or AA because that's the time you

45

1  are able to get some - like she said, relapse

2  prevention. You're able to complete your

3  sobriety. Even outside the prison system.

4        **INMATE CASTANEDA:**  I understand that and

5  as part of the parole agreement, I will go to

6  them.

7        **DEPUTY COMMISSIONER MEJIA:**  Have you

8  checked outside (indiscernible), or what kind of

9  -

10        **INMATE CASTANEDA:**  I have - yes, I have.

11  I have resources here that the institution has

12  provided me a packet of different locations

13  within the area. Upon release, if I'm - I will

14  take this and utilize it to the best of my

15  abilities. As far as - I got multiple resources

16  here of locations. Addresses -

17        **DEPUTY COMMISSIONER MEJIA:**  Like what?

18        **INMATE CASTANEDA:**  Well, I have - I know

19  I highlighted it.

20        **DEPUTY COMMISSIONER MEJIA:**

21  (indiscernible) where will you go if you start

22  having more problems in the streets?  What kind

23  of resource are they going to have over there?

24  Other than family.  I know family is good

25  support. I'm very well aware of that.

26        **INMATE CASTANEDA:**  Well, there's

27  Alcoholic's Anonymous place at the church. Go

46

1 through the resources I have here to find the
2 locations.
3      **PRESIDING COMMISSIONER ST. JULIEN:**  I
4 thought you said you didn't want to go to AA?
5 You objected to going to AA because they're
6 religious.
7      **INMATE CASTANEDA:**  Well, if it was part
8 of the program, as far as my parole. I'd go. I
9 mean –
10      **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah,
11 but you made a big deal about that you don't
12 want to go to AA.
13      **INMATE CASTANEDA:**  Well, I don't want
14 religion to be forced on me.
15      **PRESIDING COMMISSIONER ST. JULIEN:**  We
16 don't either.
17      **DEPUTY COMMISSIONER MEJIA:**  We don't
18 either.
19      **PRESIDING COMMISSIONER ST. JULIEN:**  But I
20 guess that you made a big deal that you don't
21 want to go to AA, so we're just trying to figure
22 out from you, what are you going to do?  Do you
23 have a relapse prevention program? Have you – I
24 don't know – have you been asked that before?
25      **INMATE CASTANEDA:**  No, I have never.
26      **DEPUTY COMMISSIONER MEJIA:**  That's what
27 we ask every parolee from having substance abuse

47

1  (indiscernible) psych review on the house

2  arrest. Relapse prevention is something that

3  will prevent you from going back from where you

4  came from. (indiscernible).

5      **INMATE CASTANEDA**:  Like I stated before,

6  I made a conscious decision never to use the

7  stuff. I understand that people do relapse, and

8  I understand that you're not in your right mind

9  when you are under the influence and it's a

10  place that I don't ever wish to go again.

11      **DEPUTY COMMISSIONER MEJIA**:  Okay, anyway,

12  I also so the - did you say that you have

13  appealed your - you being labeled as an Isuza

14  (phonetic) 13 gang member?

15      **INMATE CASTANEDA**:  Yes, I have.

16      **DEPUTY COMMISSIONER MEJIA**:  I saw

17  something here. When you were in Pelican Bay

18  (indiscernible) Is that when you did it?

19      **INMATE CASTANEDA**:  Yeah, it was found

20  that - no, the last statement that the counselor

21  wrote, when he indicated that I was part of

22  some, so-called (indiscernible) Isuza Sureno 13

23  street gang, which doesn't even exist.

24      **DEPUTY COMMISSIONER MEJIA**:  That's in

25  your POR.

26      **INMATE CASTANEDA**:  That's in my POR?

27      **DEPUTY COMMISSIONER MEJIA**:  Say you are

48

1  slightly - page number

2         **PRESIDING COMMISSIONER ST. JULIEN:**

3  Probation.

4         **DEPUTY COMMISSIONER MEJIA:**  Probation -

5  yeah.

6        **INMATE CASTANEDA:**  That I have slightly a

7  - well, because I'm not.

8        **DEPUTY COMMISSIONER MEJIA:**  That's where

9  she based it - we based it from.

10        **INMATE CASTANEDA:**  I've never been ever

11  arrested for any type of gang activities. I've

12  never participated in any gang activities. I

13  went to school within the city limits of Isuza

14  where other members - I mean other students -

15  you know, but as far as participating in any

16  type of gang activities, no.

17        **DEPUTY COMMISSIONER MEJIA:**  So, when did

18  you file that appeal?

19        **INMATE CASTANEDA:**  That was back in '93

20  when I filed an appeal on the counselor's -

21        **DEPUTY COMMISSIONER MEJIA:**  What prison?

22        **INMATE CASTANEDA:**  Right here in Soledad.

23        **DEPUTY COMMISSIONER MEJIA:**  Yeah. I found

24  the one from Pelican Bay when (indiscernible)

25        **INMATE CASTANEDA:**  Right here in Soledad

26  when he gave me the report that he had written

27  up.

49

1        **DEPUTY COMMISSIONER MEJIA:**  But anyway, I

2   feel that (indiscernible) it's going to come up

3   as you're an associate. And some will be

4   (indiscernible) at Pelican Bay they were saying

5   that the shooting was gang related. I don't

6   (indiscernible) in the PR saying slightly

7   associated.

8        **INMATE CASTANEDA:**  No. This was an

9   individual. It had no ties with no gangs,

10  whatsoever.

11       **DEPUTY COMMISSIONER MEJIA:**  What have you

12  learned so far as - because I was looking at the

13  situation. You have - there's no - no need to be

14  back there and whose weapon was it?

15       **INMATE CASTANEDA:**  Just somebody that -

16  One of the guys that went with me. I had asked

17  him if he could get me one, but he didn't know

18  what I was going to use it for.

19       **PRESIDING COMMISSIONER ST. JULIEN:**  Last

20  year you said you had it (indiscernible) around

21  that house.

22       **INMATE CASTANEDA:**  Well, yeah. I had

23  asked him to get me one and I had it around the

24  - this was awhile back, before the incident even

25  happened because my house had gotten broken into

26  and I didn't call the cops or nothing. I just

27  figured I'd catch whoever was - I was young and

50

1  not thinking. Well, I was immature.

2          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

3          **DEPUTY COMMISSIONER MEJIA:**  So, between -

4  - so you did one Anger Management in 2005 and

5  then you did the Anger Management in 2002, also.

6          **INMATE CASTANEDA:**  It was a project

7  change.

8          **DEPUTY COMMISSIONER MEJIA:**  Yeah. What

9  happened to the impact program that you - that

10 you went on the waiting list for?

11         **INMATE CASTANEDA:**  They don't have it no

12 more.

13         **DEPUTY COMMISSIONER MEJIA:**  They don't

14 have it. What have you learned about anger

15 management?

16         **INMATE CASTANEDA:**  How to control my

17 situation. I can only control my environment

18 around me. I can't control other people's

19 situation. Getting in a tight situation - take

20 the time to think before you react.

21         **DEPUTY COMMISSIONER MEJIA:**  Well, you've

22 had a lot of time to think before you reacted in

23 that situation.

24         **INMATE CASTANEDA:**  Yeah, I was really

25 upset - mad. I was really mad. At the time, I

26 was mad.

27         **DEPUTY COMMISSIONER MEJIA:**  Let me go

51

1  back - go to your psychological report, October
2  17, 2002. Isn't that - we're looking at the same
3  document, Counsel? That's the most recent? This
4  was Dr. Hewchuk, H-E-W-C-H-U-K. Staff
5  Psychologist. Let's go back to - the reason I
6  was focusing on the substance abuse is that's
7  also his issues when it comes to the substance
8  abuse history.  During the clinical interview,
9  Inmate Castaneda denied the habitual use of both
10 alcohol and drugs although he admitted to
11 drinking socially and occasionally experimenting
12 with marijuana. At the same time during his 1999
13 clinical interview conducted by Dr. Martin
14 Harshfeld (phonetic), in preparation for both
15 prison (indiscernible) terms, psychological
16 report, Inmate Castaneda admitted that following
17 separation from his wife (indiscernible) for a
18 period of two years, (indiscernible) indicate
19 that heavy alcohol use was (indiscernible).
20 Most recently -so that was the issue, that's why
21 I said the alcohol needs to be addressed here
22 and also outside in the streets. We were going
23 to stress - we were going to stress how you do
24 that.  Stressing on life here is different than
25 (indiscernible)
26         **INMATE CASTANEDA**:  I understand that. All
27 I can do is one day at a time. Moment by moment

52

1    - in the moment. I know, like I said, I know

2    alcohol impairs you and that's a state of mind I

3    don't wish to visit ever again. I say that with

4    all sincerity.

5         **DEPUTY COMMISSIONER MEJIA:**  And the

6    diagnostic impressions of that time also was

7    Axis I, alcohol abuse and institutional

8    (indiscernible). No (indiscernible) personality

9    disorder Axis II, Axis III, Level II

10   (indiscernible), Axis IV incarceration, Axis V

11   (indiscernible). According to these

12   psychologists, Inmate Castaneda appears to have

13   addressed both anger management and alcohol

14   abuse issues. During the course of his

15   incarceration consequently providing that

16   alcohol and drug abstinence is maintained.

17   (indiscernible) Inmate Castaneda's prognosis for

18   community adjustment is good.  Assessment of

19   dangerousness: Inmate's violence potential

20   (indiscernible) institutional setting is below

21   average, relatively in provocation. This

22   conclusion is based on private (indiscernible).

23   Relative (indiscernible) free. Only have one 115

24   in 19 - in the year of -

25        **INMATE CASTANEDA:**  Year 2000.

26        **DEPUTY COMMISSIONER MEJIA:**  2000.

27   (Indiscernible) during lockdown. And three

53

1  128's. If released into the community - this
2  conclusion is based on the fact that he has to
3  make - (indiscernible) duration of his
4  incarceration and as for (indiscernible) if
5  released into the community, Inmate Castaneda's
6  violence potential is estimated below normal
7  than the average citizen. Providing that drug
8  and alcohol abstinence is strictly enforced.
9  Should he be released, it is recommended that
10 Inmate Castaneda receive the regular supervision
11 and close monitoring with respect to alcohol
12 abuse.  Mr. Castaneda is competent and
13 responsible for the (indiscernible) behavior. He
14 has the capacity (indiscernible) institutional
15 standards and (indiscernible). Inmate Castaneda
16 does not have the history of mental disorder
17 which would necessitate treatment in or during
18 his incarceration period or following parole.
19 Inmate Castaneda (indiscernible) use of alcohol
20 (indiscernible) consequently it is recommended
21 his behavior be monitored closely during his
22 parole. Due to a very strong support system from
23 both his parents and children, it is expected
24 that Inmate Castaneda (indiscernible) back in
25 society will be an uneventful process. Any
26 additions, Counsel?
27        **ATTORNEY SPOWART:**  I have nothing right

54

1  now at this time.

2      **DEPUTY COMMISSIONER MEJIA:**  Commissioner?

3      **PRESIDING COMMISSIONER ST. JULIEN:**

4  Excuse me, okay.  There's another inflammatory

5  statement you made that I just want to clear up.

6  It was at the time of the crime. You said, "His

7  day will come someday, I won't say when". After

8  you said you'd wished you'd had a bigger gun.

9  Okay, so should we interpret that as a future

10  threat?

11      **INMATE CASTANEDA:**  No. I – I know I said

12  that and I'm sorry I said that. Like I said, I

13  was angry at the time. I'm not that person I am

14  today. I wish – I'm sorry. I apologize, I'm

15  truly sorry.

16      **PRESIDING COMMISSIONER ST. JULIEN:**  And

17  perhaps you can, in your closing statement or

18  whatever, talk – address what you're going to do

19  – how you're going to handle situations being

20  back in that same community. Let's say – you

21  know, if you run into Mr. Carrion or some of his

22  family.

23      **INMATE CASTANEDA:**  I don't know –

24      **PRESIDING COMMISSIONER ST. JULIEN:**  I

25  mean, what if they're out to get you?

26      **INMATE CASTANEDA:**  All I can do is call

27  the authorities and hopefully they will react –

55

1  you know - take care of the situation. I will
2  not react the way I did last time.
3      **PRESIDING COMMISSIONER ST. JULIEN:**  Mr.
4  Jacobs, do you have other questions for Mr.
5  Castaneda?
6      **DEPUTY DISTRICT ATTORNEY JACOBS:**  Yes, I
7  do. Mr. Castaneda indicates his ex-girlfriend
8  was apparently our victim's brother's girlfriend
9  was named Gloria, however, I'm reading police
10 reports that were provided for me and I see an
11 interview with a Lisa Busaro (phonetic) and she
12 apparently - or Bucera - she apparently was the
13 girlfriend according to her statement. I'd like
14 some clarification as to who were talking about.
15 Is it Lisa or Gloria that was driven to the
16 Carrion house that caused the confrontation?
17     **INMATE CASTANEDA:**  It was - Gloria was
18 the driver that - is how she got there.  Lisa is
19 the girl that started the confrontation with the
20 female at my house.
21     **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
22 and I think I actually probably said the name
23 Gloria. I might have been wrong - obviously I
24 was wrong.
25     **DEPUTY DISTRICT ATTORNEY JACOBS:**  In the
26 reports that I read, I find that Mr. Carrion -
27 or Mr. Castaneda has made several statements to

56

1  probation, to investigating officer and that

2  after the altercation - after he was "beaten

3  up", he then ran to a nearby friend's house and

4  got gas from him.  Is that in fact, a true

5  statement?

6        **INMATE CASTANEDA:**  Yes, it is.

7        **DEPUTY DISTRICT ATTORNEY JACOBS:**  Next

8  question would be is - considering that there

9  was obvious animosity there and we have

10  involvement between a boyfriend and an ex-

11  boyfriend that was obviously rapidly going

12  downhill, why did the inmate make such a scene?

13  Why didn't he just go to his friend's house

14  nearby and get gas?

15        **INMATE CASTANEDA:**  I was - I was closer

16  to the residence that I had dropped the female

17  off and figured, you know, there was no

18  animosity at the time.  I didn't know that that

19  was going to take place. I didn't know who the

20  people were.  I knew she - I had dropped her off

21  there, I was hoping to just get help, get gas

22  and not anything else.

23        **DEPUTY DISTRICT ATTORNEY JACOBS:**  Does

24  the prisoner remember talking to the two

25  investigating officers from Isuza P.D.,

26  Detective Arnold and Detective Compton?

27        **INMATE CASTANEDA:**  I don't recall - I

57

1 read the police report.

2        **DEPUTY DISTRICT ATTORNEY JACOBS:**  Does

3 the prisoner recall talking to any police

4 officer and having the interview tape recorded?

5        **INMATE CASTANEDA:**  No, I don't.  Unless

6 it was when they came to my house and they were

7 recording it and I gave them approval to search

8 my house.

9        **DEPUTY DISTRICT ATTORNEY JACOBS:**  I have

10 a statement, Isuza police report, dated October

11 11, 1990 relating a tape-recorded interview of

12 the inmate by Detective Jerry Arnold and

13 Detective Compton of the Isuza Police Department

14 it was held in the jail interview room. I'd like

15 to ask some questions from the statements

16 thereabout to clarify the chain of events.

17        **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah,

18 if there's just a couple - do you have just a

19 couple questions?

20        **DEPUTY DISTRICT ATTORNEY JACOBS:**  In that

21 statement, the prisoner told the officers that

22 when he went to the Carrion house to help get

23 assistance from the girl to get gas, the girl

24 refused to come out and talk to him and a male

25 subject told him to "fuck off and leave".  Did

26 that happen?

27        **INMATE CASTANEDA:**  Yes, it did.

58

1          **DEPUTY DISTRICT ATTORNEY JACOBS:**  At that
2    point, the inmate indicated that he and the male
3    subject exchanged verbal challenges with each
4    other and eventually he told the subject, "If
5    you want trouble dude, jump over the fence".
6    Did that occur?
7          **INMATE CASTANEDA:**  Not exactly like that.
8          **DEPUTY DISTRICT ATTORNEY JACOBS:**  What
9    happened?
10          **INMATE CASTANEDA:**  When the female told
11    me she was not coming out, then I told her don't
12    ever come to my house again.  At that point, the
13    male occupant asked me if I wanted problems, I
14    said "You know what, I'm done with you.  If you
15    want to jump over the fence, I'm out of here".
16    And that's when he jumped the fence.
17          **DEPUTY DISTRICT ATTORNEY JACOBS:**  I ask
18    the question again of the inmate.  At the point
19    in time when the - when Lisa indicated she
20    didn't want to him around -
21          **ATTORNEY SPOWART:**  I may object anymore.
22    We're not here to re-try the case.  It was a
23    plea-bargain.  He admitted what happened.  I
24    don't understand what he's - we're not here to
25    re-try the case.
26          **DEPUTY DISTRICT ATTORNEY JACOBS:**  I would
27    like to know why he didn't go get gas from his

59

1    friend instead of carrying on this argument that

2    eventually led to a shooting.  It's real simple.

3    They had a nearby friend eventually providing

4    gas, yet the inmate had opportunities to go

5    there and did not go and I'd like to know why.

6         PRESIDING COMMISSIONER ST. JULIEN:  Just

7    say the last - this will be the last question.

8    Because we don't need to re-try this -

9         INMATE CASTANEDA:  Like I said, I was

10   closer to the residence that I dropped the

11   female off.  It wasn't until I got away from

12   them further away enough to where I got closer -

13   I was more further away from my house than I was

14   when I started getting to my house, my friends

15   live closer - the people that I got gas from

16   live closer from my house.  So in other words, I

17   went - let's see how - the closer I got to my

18   house, I ended up at their house first and I

19   noticed that they were home and I asked them for

20   help.

21        PRESIDING COMMISSIONER ST. JULIEN:  Okay,

22   Mr. Spowart?

23        ATTORNEY SPOWART:  This area you lived

24   in, what is the name of the town?

25        INMATE CASTANEDA:  The City Isuza.

26        ATTORNEY SPOWART:  Isuza?

27        INMATE CASTANEDA:  Yes.

60

1          **ATTORNEY SPOWART:**  Okay, you stated that

2     there is a gang in this area?

3          **INMATE CASTANEDA:**  Well, there's gangs in

4     all cities.

5          **ATTORNEY SPOWART:**  Yeah, I mean - local.

6     This was a local gang.

7          **INMATE CASTANEDA:**  Well, yeah in the

8     public schools there are -yeah, there are gangs

9     within this school district.

10         **ATTORNEY SPOWART:**  From the neighborhood?

11         **INMATE CASTANEDA:**  Yes.

12         **ATTORNEY SPOWART:**  So you knew some of

13    these guys?

14         **INMATE CASTANEDA:**  Well yeah, I went to

15    school with them, yeah.

16         **ATTORNEY SPOWART:**  Okay.

17         **INMATE CASTANEDA:**  I played baseball with

18    them. I grew up with them, but as far as running

19    with that particular gang, no I didn't.

20         **ATTORNEY SPOWART:**  I have no further

21    questions.

22         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

23    a closing statement, Mr. Jacobs?

24         **DEPUTY DISTRICT ATTORNEY JACOBS:**  The

25    prisoner indicates that he was not affiliated

26    with a gang, yet police reports that have been

27    provided for me today indicate otherwise.  We

61

1  have 19 - in 2003 this was gone over with the
2  prisoner at the Board hearing there and they
3  related a whole series of events.  The prisoner
4  going to Pelican Bay, documentation of street
5  gang affiliation, ongoing gang problems with
6  Hispanics after leaving Pelican Bay and Ad Seg.
7  His - I believe it was the Board Report - I'm
8  sorry it was the hearing that - 1997
9  Commissioner Conin (phonetic)indicated that if
10  he continued doing what he was doing in 1990 and
11  1991, he would be in prison forever.  And what
12  that referred to was apparently a confidential
13  file indicating he was a shot caller for MA.
14  So, I think the Board needs to consider how
15  truthful the prisoner was in regards to his gang
16  affiliation, because it seems to extend at least
17  initially, into his - into the prison when he
18  was sent here, however, that's not my concern.
19  My real concern is is that his attitude problem
20  that he is just beginning to overcome does not
21  apply to his alcohol abuse which he tends to
22  minimize every time he's questioned about it.  I
23  went through the post-conviction progress
24  reports and after reading them all and writing
25  them down, this is what I've determined.  From
26  reception in 1991 to 1997, he had no
27  participation in self-help groups or group

62

1  activities.  February, 2003 to 2005 he did not
2  participate. He's been in custody for 14 years
3  and for seven years plus two and a half years
4  for a total of nine and a half years, he did not
5  participate in self-help such as AA, even though
6  alcohol was a contributing factor to the life
7  crime, according to several psychological
8  reports.  That means he's been in therapy self-
9  help for about one third of his total stay at
10 CDC, which is dismal showing that considering
11 the fact that had he not been drinking he
12 probably not - probably have not committed this
13 crime.  At one point in time, it was suggested
14 that he needed to develop an AA contact in the
15 community before he was paroled and develop a
16 plan.  Apparently he's got a package that was
17 given to him but I've seen no indication that
18 he's made contact with any of the organizations
19 in that package in preparation for his parole
20 and I'm real concerned that this could happen
21 all over again if he goes out into the
22 community, he starts drinking again and ends up
23 with an altercation or a frustration that he
24 interprets being threatening and who knows, he
25 had a relatively clean record before the
26 shooting occurred and we just really can only go
27 by what has happened in the past to predict what

63

1   will happen in the future.  As far as his

2   vocational goes, I have indications he's got a

3   vocational certificate in upholstery but it

4   shows he was dropped from upholstery and his

5   progress reports on 1/26/99 -

6          **DEPUTY COMMISSIONER MEJIA**:  He completed

7   that.

8          **DEPUTY DISTRICT ATTORNEY JACOBS**:  Pardon?

9          **DEPUTY COMMISSIONER MEJIA**:  He completed

10  upholstery.

11         **DEPUTY DISTRICT ATTORNEY JACOBS**:  He did

12  complete that.  In regards to his C&C training,

13  he's got about 1500 hours of on the job training

14  experience which amounts to about 38 weeks of

15  employment if he was doing this out in the free

16  community, so he would be entering - if he would

17  get a C&C job - he would be entering as a

18  beginning operator or an apprentice operator,

19  not as an experienced operator, because he's had

20  less than a year of experience.  I think he

21  needs to work on his alcohol a lot more.  I

22  think he needs to build a program so we are

23  ensured what happened back in 1990 will not

24  happen again and I think it wouldn't hurt him if

25  he got some more C&C experience because it

26  certainly would add to his employability once he

27  reaches the streets and that's (indiscernible).

64

1      **PRESIDING COMMISSIONER ST. JULIEN**:  Okay,
2  thank you.  Mr. Spowart?
3      **ATTORNEY SPOWART**:  Yes, to begin with -
4  the Board asked him some pretty hard questions
5  today and he was forthright (indiscernible) in
6  answering this - answering "Why did he do this?"
7  "I was angry".  "They beat me up and shot at me
8  and I went back and -", told exactly what
9  happened.  What has he done about that?  Well,
10  he's had therapy; he's had two anger management
11  courses since he's been down.  He's able to tell
12  you how he would contain himself as far as anger
13  goes.  Was alcohol a factor?  He admits it was.
14  He probably wouldn't have done that if he hadn't
15  been drinking.  He's been in AA.  He showed me
16  just a bunch of chronos.  Recently he hasn't
17  been in but Commissioner, I hope you understand
18  , I was surprised, you asked him, "What's the
19  first step?" "What's the second step?" It's been
20  quite awhile since he's been in there.  He knows
21  these steps.  He hasn't memorized them all but
22  he can tell you because they make sense to him.
23  He understands that's what he's going to have to
24  do and I told him before we came in here, I
25  said, You know, you haven't been in AA and their
26  going to hammer you on this.  He says, yeah, I
27  know.  He said, I went to court on it.  He says,

65

1  with this religious thing I don't like.  But he

2  says, I expect if I get date, they're going to

3  say, you have to go be in it on the outside.

4  And he says, that's fine with me. I'll be in it

5  on the outside.  He's objected, he told you why.

6  You've had other people tell you the same thing.

7  Too many of these programs in here - people are

8  going and taking space and their not paying

9  attention.  He's serious about it.  One thing

10 that really concerned me is discussion here

11 (indiscernible). This thing about the gang. And

12 I'm gonna - where do these counselors get their

13 information?  They go to the probation officers.

14 Now here's what the probation - gang activity:

15 When interviewed by the probation officer, the

16 defendant denied any type of gang affiliation;

17 however, according to information from Isuza

18 Police Department, the defendant apparently has

19 some slight ties with the Isuza 13 gang.  Slight

20 ties.  That's why I asked him, is a gang in that

21 area?  Yeah, it's a neighborhood gang.  You know

22 these guys?  Yeah, I know these guys.  I went to

23 school with them.  He had slight ties.  He was

24 not - they don't say he was a gang member.  They

25 do not say that.  He had some slight ties

26 because he knew these people.  You can't avoid

27 it.  That's where you grew up.  That's the kids

66

1   you knew in grade school and high school and

2   whatever.  He had no juvenile record.  If he'd

3   been a hard rock gang member, he'd a been picked

4   up, you'd better believe it. Sometime along the

5   way. Had no juvenile record. A good stable

6   history. A good family upbringing. Showed me

7   pictures of his dad. His dad was a retired army

8   sergeant who was in the parades and burials they

9   show up - the people of military burials. A good

10   solid family. He worked for his brother's carpet

11   cleaning business for two years and then he was

12   a forklift driver, Price Club. He was married

13   and had problems then he has this crime. What is

14   the motivation for the crime? You always ask

15   this, and he was flat out. Didn't - did not deny

16   it. I was angry. I was mad. These guys beat me

17   up. All I wanted was to get gas and

18   (indiscernible) and they beat me up. I left and

19   brooded about it and came back. That's what he

20   did. He's just (indiscernible). He understands

21   what happened. He takes full responsibility. He

22   didn't --- that's why I objected to the D.A.'s

23   questions. He pled. He admits to everything. He

24   has remorse and expresses to the psyches and

25   expressed it here to you today. Adult

26   convictions, two misdemeanors for violence. So

27   prior to this, growing up in this area, where

67

1  there's gangs, where he had apparently had some
2  slight contact because he knew these guys. He's
3  never been (indiscernible) problems. He was 27
4  then. He was not a kid and he said that. He was
5  27, he was immature. He can't say, well, I was a
6  kid. No, he was 27. He got mad because they beat
7  him up. His parole plans are very good. He's got
8  a place to be with his parents. Seek work in the
9  upholstery industry. Completed auto upholstery
10  vocation also a PIA in a furniture factory. Now,
11  the D.A. says, well, he doesn't have that much
12  experience. He's had as much experience as he
13  can get in here. That's where he is and he's not
14  - and he hasn't missed an opportunity to take
15  advantage of it. He's employable when he gets
16  outside. His prison adjustment - only one 115 in
17  the entire incarceration and that was non-
18  violent. He has three 128a's. The last was '95.
19  He completed (indiscernible) project change. His
20  class score is 19 which, as you know, is
21  practically zero. But, under the new rules they
22  have to - lifers have to have a minimum, they
23  can get down to 19. Work reports are exceptional
24  and above average. He's got his GED. The psych
25  report is very positive. Incidentally, the last
26  two psych reports have been positive. Both of
27  them said he's no more danger on the outside

68

1  than the average person. And again, people say,
2  how can you say that? Nobody's attempted to
3  shoot - attempted murder on the outside.  Well,
4  that was then, this is now. This is after he's
5  taken these changes, these courses he's taken.
6  Anger Management, two courses in Anger
7  Management. Commissioner (indiscernible) pretty
8  thoroughly. Project change, anger management,
9  very positive psych report. And the psyches
10  rightly say that he's done very well and he's no
11  danger. He's got a consideration - has got to be
12  his alcohol abuse. He'll admit that. Is that
13  going to (indiscernible) Well, we're not going
14  to give you a date today. My God, I - the psych
15  is being honest, he's just saying this man has
16  done everything. He understands the factors. He
17  understands what he has to be away from. It's
18  just based on his past history; he's going to
19  have to continue. I talked about this and he
20  said, yeah, I (indiscernible). I'm sure if I get
21  a date, they're going to say, you got to be in
22  AA. He said, that's fine with me. To be outside,
23  it's a lot different than being in here. And
24  incidentally, he's got a bunch of chronos that
25  he did participate in. So when you come right
26  down to it, you got the life crime for what he's
27  here and that's why he's here and now you got

69

1   what he's done since he's been here, which shows
2   that he's suitable. Two of the last two psych
3   reports said he's suitable. They don't mince
4   words about it and they both say alcohol is a
5   factor and he has to adjust. But, he's no danger
6   - more danger on the outside than the average
7   person. Both times. Both psych reports say that.
8   And if he's no danger than the average person,
9   then he's certainly not an unreasonable risk of
10  danger to society which is the standard by which
11  you're supposed to deny him. An unreasonable
12  risk. So I'd ask for a date to be set for
13  parole.
14          **PRESIDING COMMISSIONER ST. JULIEN**:  Thank
15  you. Mr. Castaneda?
16          **INMATE CASTANEDA**:  First and foremost,
17  I'd like to apologize. I take responsibility.
18  I've held myself accountable for what I'd done.
19  I have no one to blame but myself. I've done
20  nothing but think about what I could do to
21  change the situation and it's an unchanging fact
22  that I did and I apologize and I'm sorry for
23  what I did. All I can do is - from the time of
24  incarceration, my time and my commitment is to
25  look forward and to better myself to help my
26  family understand what I did was wrong. I
27  understand that. I make no excuses for my

70

1   action. Like I said, I do take responsibility
2   for – I'm truly sorry. I learned quite a bit of
3   marketable skills in my time being incarcerated.
4   I completed many – many trades. Upholstery,
5   which was something I was going to follow up on.
6   My father-in-law left me the necessary tools.
7   You have a support letter in there from Mr.
8   Manuel Geary (phonetic), who's deceased. He
9   passed away in 2000. I've got multiple work
10  supervision reports here. When I started the
11  C&C, they gave me the responsibility to operate
12  machines in estimate of $150,000. I've been on
13  the machines since 12 of '03. I've got nothing
14  but threes and twos as my work report. My recent
15  one is of March of this month of 2006. That's
16  what, three – three years? Almost two and a
17  half, three years of C&C operation. I understand
18  I only have a 1500 hour certificate. Certified
19  and qualified to operate a C&C. That is what I'm
20  looking forward to. I only make 65 cents. If I
21  was to get a job as a C&C operator, and I have
22  the necessary sources that my father provided
23  for me to write to these companies, I'm
24  currently waiting for a response. But how do I
25  give them the hope to hire me when I'm still
26  incarcerated? My family needs me. I'm sorry for
27  what I've done. I make no excuses. All I ask is

71

1   that - please weigh the - take all this into
2   consideration. Factor it in. I'm not a threat to
3   society. I've learned my lesson. I am sorry. I
4   do apologize. I can never put myself in this
5   situation. I can never put my family through
6   this and if I do ever run into Mr. Carrion, I
7   wish him all the best of luck. I will apologize
8   to him. If I could apologize to him in person, I
9   would. I have no animosity towards no one. I'm
10  not angry. I'm not mad at nobody. I've learned
11  my lesson. All I ask is, you know, that I be
12  returned back to my family and be able to live a
13  productive life. Pay my bills, pay my taxes and
14  enjoy my family. I've missed out on a lot and
15  I'm truly sorry. I apologize.
16        **PRESIDING COMMISSIONER ST. JULIEN**:  Thank
17  you very much. We will recess (indiscernible)
18  for deliberations.
19                    **R E C E S S**
20                    --oOo--
21
22
23
24
25
26

72

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                 **D E C I S I O N**

3      **DEPUTY COMMISSIONER MEJIA:**  Okay, we are

4      now on record.

5      **PRESIDING COMMISSIONER ST. JULIEN:**  All

6      parties have returned to the room in the hearing

7      for Martin Castaneda. Mr. Castaneda, we are

8      going to deny parole today. I'll read you the

9      decision and then give you a couple of

10     suggestions. And, we reviewed all the

11     information received from the public and relied

12     on the following: Circumstances (indiscernible)

13     the inmate is not yet suitable for parole plus a

14     danger to society if released from prison. As it

15     regards the commitment offense and this was the

16     intent to murder of Fidel Carrion on October 9,

17     1990 in the City of Isuza.  the (indiscernible)

18     carried out in a (indiscernible) manner involved

19     the inmate (indiscernible) apparently been - got

20     into a fight with the victim and his brother the

21     night before and the inmate was very - became

22     very angry and wanted retribution for this

23     attack. He apparently had drunk a lot which

24     festered his anger and went back to the location

25     where the victim lived with a shotgun and

26     proceeded to shoot the gun seven

27     **M. CASTANEDA E-89355 DECISION PAGE 1 3/15/06**

73

1    times. And the - Mr. Carrion was shot five times
2    in the chest, groin, and arm. And indeed, as I
3    think we (indiscernible) the motive for the
4    crime was very trivial in relation to the
5    offense in that it was uncontrollable anger. The
6    inmate has two previous adult probation terms
7    and the psychological report by Dr. Hewchuck,
8    dated October 11, 2002 is favorable. It says you
9    would be a low risk of danger as long as you
10   were able to abstain from any substance abuse.
11   In terms of parole plans, you do have viable
12   residential plans with your parents and you also
13   have employment plans. You had a letter from a
14   family friend who owns a business and you also
15   have marketable skills in furniture upholstery
16   and as a machinist. And perhaps the next time if
17   you could prepare a little detailed information
18   on your parole plans. I know it's in the - it
19   shows up in the Board Report but sometimes those
20   change. Perhaps you can also get two
21   alternatives - you know, for residence. One with
22   your parents, maybe one from your brothers. You
23   know, just kind of detailed. You know, just
24   write out some detail plans. In terms of where
25   you're going to live. What your plans are for
26   your job.
27   **M.CASTANEDA E-89355 DECISION PAGE 2 3/15/06**

74

1          **INMATE CASTANEDA**:  I had submitted my
2    parole plans in the - oh, man you guys don't
3    have that in your - in my file.
4          **PRESIDING COMMISSIONER ST. JULIEN**:  I
5    didn't see this. You did this last year?
6          **INMATE CASTANEDA**:  Yes. As a matter of
7    fact, I did that last hearing also. I submitted
8    one. That's just updated.
9          **PRESIDING COMMISSIONER ST. JULIEN**:  No, I
10   didn't see this. Did you see this, Mr. Mejia?
11   That's usually something I ask people to do.
12         **INMATE CASTANEDA**:  Along with a copy of
13   what my business - business card would look like
14   as an upholsterer.
15         **PRESIDING COMMISSIONER ST. JULIEN**:  You
16   gave all that?
17         **INMATE CASTANEDA**:  It's in my file.
18         **PRESIDING COMMISSIONER ST. JULIEN**:  Don't
19   stand up.
20         **INMATE CASTANEDA**:  I'm sorry.
21         **PRESIDING COMMISSIONER ST. JULIEN**:
22   You're going to get your officers kind of
23   nervous.
24         **INMATE CASTANEDA**:  I'm sorry. I mean no
25   harm to nobody.
26         **PRESIDING COMMISSIONER ST. JULIEN**:  This
27   **M. CASTANEDA E-89355 DECISION PAGE 3 3/15/06**

75

1  is very good. Okay, however the factors of our -
2  - I'm glad to see this. The denial isn't based
3  on your parole plans, but I am glad to see this
4  because this was going to be a suggestion I had
5  for you to -B you know, really outline - (tape
6  ended)
7         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
8  well, that's my fault that I didn't see it. I
9  guess I didn't see this section I - first part
10 of this section. I've never seen an inmate
11 submit information in these parts. So, I'm sorry
12 I didn't see that.
13        **INMATE CASTANEDA:**  It was part of the
14 criteria that as far as my realistic parole
15 plans.
16        **PRESIDING COMMISSIONER ST. JULIEN:**  Well,
17 that's very good. Well, I did find that you had
18 realistic parole plans.
19        **INMATE CASTANEDA:**  Yeah, I have
20 marketable skills as far as part of the criteria
21 also.
22        **DEPUTY COMMISSIONER MEJIA:**  We don't have
23 a problem with marketable skills.
24        **PRESIDING COMMISSIONER ST. JULIEN:**  And I
25 outlined that just now. No, okay well I'm glad
26 to see that you did this. Okay, that's good.
27 **M. CASTANEDA E-89355 DECISION PAGE 4 3/15/06**

76

1   Like I said, that's not part of the - and I'll
2   outline that in a minute. Okay, we do note that
3   in response to 3042, on notices the District
4   Attorney of Los Angeles County is
5   (indiscernible) and we find that you continue to
6   need self-help in order to face, discuss, and
7   understand and cope with stress (indiscernible)
8   and conflict in a non-destructive manner. And,
9   so primarily my issues with you are that - and I
10  did spend a lot of time with you today. I
11  usually like to spend with people and really
12  grill them on things if I think they're close.
13  Okay? So, I did feel that way, I still feel that
14  way. But there are certain things that you do
15  need to do, okay? And I think they're the
16  difference between your getting a date and not
17  getting a date. So, if you get these
18  transcripts, I'd like you to really peruse them
19  and I think you're serious about your parole.
20  Obviously you're serious if you're taking the
21  time to prepare all this stuff. I guess the
22  first thing is, if there is - next time if there
23  is something you submitted or prepared, you
24  know, make sure you have a copy and show it to
25  us.
26          **INMATE CASTANEDA:**  Okay.
27  **M. CASTANEDA E-89355 DECISION PAGE 5 3/15/06**

77

1        **PRESIDING COMMISSIONER ST. JULIEN:**  You

2    know, when you first come in. So that we can be

3    assured that we know about it. And, secondly,

4    you need a relapse prevention program, okay? So

5    just as you prepared the outline for what you're

6    going to do, include - you have to include this

7    in your parole plans, too. Because, it's

8    important to everybody, okay?  And my colleague

9    is going to elaborate a little more on why it is

10   so important that you know at this point it's

11   important that you incorporate and you be able

12   to demonstrate that you are never going to have

13   another episode, okay?

14        **INMATE CASTANEDA:**  (Indiscernible)

15        **PRESIDING COMMISSIONER ST. JULIEN:**  No,

16   because what are words?

17        **INMATE CASTANEDA:**  That's all we have is

18   our words.

19        **PRESIDING COMMISSIONER ST. JULIEN:**  No,

20   No. We have our actions and we need to know that

21   you're going to take your words and put them

22   into action out there. Okay? (Indiscernible) and

23   he'll elaborate a little more, okay? And then

24   number two, the issue that is haunting you is

25   this (indiscernible) or slight gang affiliation

26   or whatever it may be. 602 - couldn't find a 602

27   **M. CASTANEDA E-89355 DECISION PAGE 6 3/15/06**

78

1   in there. Get it out of there. I would also

2   maybe type up a statement. You know, I grew up

3   around these guys. It was alleged that I was a

4   member. I wasn't or whatever the story is. Make

5   sure it's truthful.

6       **INMATE CASTANEDA:**  I have to go through

7   the institutional procedures -

8       **PRESIDING COMMISSIONER ST. JULIEN:**  Yes,

9   I think that you must do that.

10      **DEPUTY COMMISSIONER MEJIA:**  I said that

11  to you last time, so -

12      **PRESIDING COMMISSIONER ST. JULIEN:**

13  Because it's going to go - it's not going to go

14  away.

15      **INMATE CASTANEDA:**  Yeah.

16      **PRESIDING COMMISSIONER ST. JULIEN:**  And

17  then we need to ramp up your self-help and your

18  programming. So, I know you're very busy at

19  work. I know you've done things in the past but

20  I'm sure as you know at this point in time, this

21  is a very tough road to getting a parole date.

22  So you have to excel. You have to go above and

23  beyond the norm, okay? If it involves you having

24  you have your parents send you some books on

25  anger - you know, how to control anger or why

26  you're - you know, substance abuse, or you know,

27  **M. CASTANEDA E-89355 DECISION PAGE 7 3/15/06**

79

1  whatever. Read books. Bring in books - you

2  know, don't come in and say there's nothing

3  available. You know, do what you can for

4  yourself, okay? Take the initiative and you

5  can't do a whole lot in here, but one of the

6  things we are recommending these days is a self-

7  study program. You know, read ten - read a book

8  a month on a self-help issue. Keep a list of

9  what you got from it. That type of thing. I

10 don't know what's in the library here, but you

11 know, maybe there's something in here or maybe

12 you can get something from the outside. So those

13 are, I think three things that I think would

14 really be the case for you. Because when we see

15 these elements that are missing or that are

16 there and glaring at us - you're giving us a

17 reason to deny you. Okay? And it's up to you to

18 not - for us to just be able to sit over and

19 say, well God, he's done everything he can while

20 he's here and the crime is the crime and we've

21 addressed that and you've paid the price for it,

22 okay? So you cannot - and you know, the AA thing

23 - and I'm sure that might be a thing close to

24 your heart or whatever, but you can't have it

25 both ways. So, you can't fight us on the AA

26 thing and like I said before, it's not even the

27 **M. CASTANEDA E-89355 DECISION PAGE 8 3/15/06**

80

1  AA, it's just basically what's universally

2  available. So you can't say I'm against AA and

3  religion but yet, you're going to go to church.

4  You know, you're going to go to the church group

5  where there's the - you know what I mean? It

6  just doesn't bring, you know? And I'm not going

7  to say go to AA, I'm going to say, get the help

8  you need. Get the 12 step help you need. Show us

9  how you're going to incorporate it into your

10  life on an ongoing and consistent basis.

11      **INMATE CASTANEDA:**  One of the things is,

12  is one day at a time. It's a one day at a time

13  process.

14      **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah,

15  but - okay, I think you may want to step in,

16  Commissioner, on that.

17      **DEPUTY COMMISSIONER MEJIA:**  Let us - let

18  her read the decision.

19      **INMATE CASTANEDA:**  Okay, I'm sorry.

20      **PRESIDING COMMISSIONER ST. JULIEN:**  Well,

21  I'm - well, I'll give you the (indiscernible).

22  So it's a one year denial and we're going to

23  recommend that you - I'm also asking for a new

24  psych evaluation because the last one was in

25  2002 or something like that. So, remain

26  disciplinary free is to your utmost advantage.

27  **M. CASTANEDA E-89355 DECISION PAGE 9 3/15/06**

81

1  You've done excellent there. We don't have

2  anything to say about you - You know, most

3  people have disciplinary. It's phenomenal you

4  only have one, okay? Keep that one. So you do -

5  you've got a lot of pros there, but it's the

6  cons that are going to get you every time.

7  Remain disciplinary free, if available, upgrade

8  whatever way you can. Vocationally,

9  educationally, whatever. And also if available,

10  participate in self-help and design your own

11  self study program. Okay, Commissioner?

12      **DEPUTY COMMISSIONER MEJIA**:  Yes. I just

13  want to make sure that - you know I was at the

14  last hearing and I'm very much aware of

15  (indiscernible) even when (indiscernible) a

16  viable plan to have an upholstery shop opened,

17  based on the - on the (indiscernible). Also, I

18  am also saying that he does have a viable work -

19  ability to find work out there, based on the

20  certificate of proficiency, he should - when

21  they issue a certificate of proficiency, they're

22  actually saying almost like he's employable

23  (indiscernible). So, what I would like to do the

24  next time is have them write a chrono saying

25  that you are employable in this field when

26  you're out there in the streets.

27  **M. CASTANEDA   E-89355   DECISION PAGE 10   3/15/06**

82

1          **INMATE CASTANEDA**:  You didn't have that

2   in my file either?

3          **DEPUTY COMMISSIONER MEJIA**:  Well, you

4   have a certificate of proficiency.

5          **INMATE CASTANEDA**:  No, there's - I went

6   through that other program and -

7          **DEPUTY COMMISSIONER MEJIA**:  The other one

8   should not have the file on the anger management

9   also. I'm going through this one. 2005. Is that

10  what you're talking about?

11         **INMATE CASTANEDA**:  Yeah, that was in -

12         **DEPUTY COMMISSIONER MEJIA**:  And also, so

13  if you happen to have (indiscernible), then you

14  have that. I just - I already said that you are

15  - you have a marketable skill and also you have

16  an upholstery - you can use that as an

17  upholstery. Now would you listen to me before

18  you (indiscernible)

19         **INMATE CASTANEDA**:  Okay, I'm sorry.

20         **DEPUTY COMMISSIONER MEJIA**:  I already

21  said that you have a marketable skill and we

22  considered it. Because I was here the last time.

23  I don't - we don't have an issue about your not

24  finding work out there at all. Because of your

25  proficiency in the upholstery. Now, this is the

26  most important one. This is not the whole reason

27  **M. CASTANDEDA E-89355 DECISION PAGE 11 3/15/06**

83

1  for the denial but this is part of the things we
2  look at when it comes to
3  unreasonable risk to society. I went back to
4  your file and you have, I would say 1994 to
5  1999, sporadic attendance of AA and I have it in
6  here, 1994, one, two, one, two, three, four,
7  five, six, and there was a gap from 1995 -
8      **INMATE CASTANEDA:** My last attendance was
9  '99.
10     **DEPUTY COMMISSIONER MEJIA:** Okay, so if
11 you're probably going to be compared to people
12 that went to self-help. They have a consistent
13 attendance. There's no gap. Do you have the last
14 history - last court appearance - your last
15 meeting for anger management was in 2002. Your
16 last court appearance was in August 20, 2003.
17 Okay, so they (indiscernible) that. From that
18 point on, you gave me now, because it's not in
19 the file that you attended anger management in
20 2005.
21     **INMATE CASTANEDA:** Yes, I did.
22     **DEPUTY COMMISSIONER MEJIA:** Okay. It
23 appears to me that other than three hour video,
24 it's not even included (indiscernible) that
25 happened before 2003. Do you have any other
26 self-help that you have attended between 2003 of
27 **M. CASTANEDA E-89355 DECISION PAGE 12 3/15/06**

84

1    August to the present?

2        **INMATE CASTANEDA:**  Yes, I have. Through

3    the PIA, we sat through a three hour video.

4    That's what I was looking for.

5        **DEPUTY COMMISSIONER MEJIA:**

6    (Indiscernible)

7        **INMATE CASTANEDA:**  On Anger management.

8    On - here we go, right here. From Mr. Walker. I

9    thought they had submitted all this in my file.

10        **PRESIDING COMMISSIONER ST. JULIEN:**  Did

11    you do your C-File review?

12        **INMATE CASTANEDA:**  Yeah, but see, I went

13    through all this. They had that program after

14    that. I didn't go to my C-File until August, I

15    mean before August.

16        **DEPUTY COMMISSIONER MEJIA:**  This is Anger

17    Management in 2006 so you have actually two of

18    them. One given by PIA. It's a three hour video

19    (indiscernible) issues related to Anger

20    Management. And then another one (indiscernible)

21    participation two hours. Another two hour video.

22    That's actually five hours?

23        **INMATE CASTANEDA:**  Yes. I actually took

24    notes about reducing my anger. Belief system,

25    accountability, owning up to my problem, lack of

26    wisdom about anger, knowing how to control

27    **M. CASTANEDA  E-89355  DECISION PAGE 13  3/15/06**

85

1  emotions, and so on.

2      **DEPUTY COMMISSIONER MEJIA:**  This one it's

3  on the file.

4      **INMATE CASTANEDA:**  Yeah, that's an

5  updated one.

6      **DEPUTY COMMISSIONER MEJIA:**  Oh, not this

7  one. Not the updated one.

8      **INMATE CASTANEDA:**  That's the updated

9  one?

10      **DEPUTY COMMISSIONER MEJIA:**  I don't have

11  it. I just got it now.

12      **INMATE CASTANEDA:**  Yeah.

13      **DEPUTY COMMISSIONER MEJIA:**  But I - it's

14  a moot issue. We know you can find a job out

15  there. So, what I needed - the things I needed

16  to do is, you've been dealing with Anger

17  Management. Not the substance abuse. It's like

18  the Commissioner said, you have an issue with

19  attending AA or NA, you have to read books and

20  show us - and give us the name of the books and

21  show us what you've learned from those books

22  when it comes to substance abuse. Because

23  substance abuse is an issue all the way through

24  commitment offense even to the psych reports.

25      **INMATE CASTANEDA:**  Okay.

26      **DEPUTY COMMISSIONER MEJIA:**  We need to

27  **M. CASTANEDA  E-89355  DECISION PAGE 14  3/15/06**

86

1  know that you're able to keep yourself sober
2  even in an uncontrolled environment. You are in
3  a controlled environment, some people respond
4  positively to that. They don't use. But, when
5  they are in a situation where they don't have a
6  controlled environment, we need to know that you
7  are able to continue your sobriety and you need
8  to explore that, okay? What I mean by - when you
9  start reading books, you are able to articulate
10 what you would do other than - you know, your
11 family is a good resource. Going to church was -
12 you know, I thought you had a problem with
13 religious issues. AA being an issue, but you can
14 have some other (indiscernible) that you can
15 attend. You can actually seek help from, when
16 you feel that you need to use alcohol based on
17 your life's situation. That's what we're trying
18 to get from you.

19      **INMATE CASTANEDA:**  I have no problem with
20 religion.

21      **DEPUTY COMMISSIONER MEJIA:**  That's why -
22 if this alcohol wasn't an issue with you. I
23 could see why you shouldn't be going to any
24 substance abuse and making sure you're not going
25 to have a relapse and going through the same
26 issue of drinking when you're under stress
27 **M. CASTANEDA  E-89355  DECISION PAGE 15  3/15/06**

87

1   (indiscernible). All you can tell me -

2         **INMATE CASTANEDA:**  I can assure you. I

3   can assure you today, that I won't. I promise.

4   I'm sincere.

5         **DEPUTY COMMISSIONER MEJIA:**  But, that's

6   what you need to do.

7         **INMATE CASTANEDA:**  I understand.

8         **DEPUTY COMMISSIONER MEJIA:**  When you come

9   back here I want you to bring - you don't want

10  to - if you don't want to go to AA or any - give

11  me something about substance abuse.

12        **INMATE CASTANEDA:**  How about if I -

13        **DEPUTY COMMISSIONER MEJIA:**  And then you

14  can also go back and give me some - some relapse

15  prevention.

16        **INMATE CASTANEDA:**  Find a sponsor out

17  there and -

18        **DEPUTY COMMISSIONER MEJIA:**  Yeah, those

19  things. (indiscernible) that other than your

20  family - you get along with your family and who

21  else can you run to?

22        **INMATE CASTANEDA:**  Believe me, my father

23  is a very strict man and -

24        **DEPUTY COMMISSIONER MEJIA:**  Well, he

25  didn't prevent you from going through what you

26  went through.

27  **M. CASTANEDA  E-89355  DECISION PAGE 16  3/15/06**

88

1        **INMATE CASTANEDA:**  Well yeah, that's
2   true.
3        **DEPUTY COMMISSIONER MEJIA:**  Anyway, just
4   go for that. Because that's the last time we
5   talked about in 2003, do something about the
6   substance abuse.
7        **INMATE CASTANEDA:**  I understand.
8        **DEPUTY COMMISSIONER MEJIA:**  And you did
9   deal with Anger Management, that's commendable.
10  But, you didn't do much on substance abuse,
11  other than you telling me that you - you know,
12  you're not going to use again.
13       **INMATE CASTANEDA:**  That's all I have is
14  my word.
15       **DEPUTY COMMISSIONER MEJIA:**  Some people
16  have to show some - some other tangible one
17  other than words.
18       **INMATE CASTANEDA:**  I understand and in a
19  controlled environment - that's understandable.
20       **DEPUTY COMMISSIONER MEJIA:**  And you
21  should be commended for not having - for only
22  having had one 115, that was in 2000. And again,
23  last time I talked to you about it
24  (indiscernible), as long as a (indiscernible)
25  comes in here updated every year, saying that
26  you are an associate, based on the POR, it's
27  **M. CASTANEDA  E-89355  DECISION PAGE 17  3/15/06**

1  going to be brought out as an associate. So, if
2  you - just like I did the last time, you got to
3  do it the right way. 602 Additional time to
4  (indiscernible) other than this one sentence
5  (indiscernible) that (indiscernible) part of the
6  Isuza 13, then it will go all the way out to the
7  director's level and they will say yea or nay
8  and they will remove that from the file.
9      **INMATE CASTANEDA:**  It will take me a lot
10 longer than a year to do that probably.
11     **DEPUTY COMMISSIONER MEJIA:**  No, they have
12 120 days (indiscernible).
13     **INMATE CASTANEDA:**  Is that right?
14     **DEPUTY COMMISSIONER MEJIA:**  You should
15 know that. You've filed an appeal before.
16     **INMATE CASTANEDA:**  Well, I never got a
17 response.
18     **DEPUTY COMMISSIONER MEJIA:**  In 1991. No,
19 they did - there's the response. In Pelican Bay,
20 it's in the file. You didn't see it? They denied
21 it. About being (indiscernible) was part of the
22 ethnic violence in Pelican Bay.
23     **INMATE CASTANEDA:**  They denied the
24 charges of me being an associate -
25     **DEPUTY COMMISSIONER MEJIA:**  What I'm
26 trying to say - don't tell me that you don't
27 **M. CASTANEDA  E-89355  DECISION PAGE 18  3/15/06**

90

1  know the process of 602.

2      **INMATE CASTANEDA:**  No, I'm not saying I

3  don't know the process. I'm just saying that -

4      **DEPUTY COMMISSIONER MEJIA:**  Just go and

5  file a 602 and do what you need to do, because

6  it's going to come up here again next year -

7      **INMATE CASTANEDA:**  I understand, okay.

8      **DEPUTY COMMISSIONER MEJIA:**  Or a year

9  from now or two years from now that you're still

10  a (indiscernible) until that 812 is cleared up.

11  That's the same thing I told you the last time.

12      **PRESIDING COMMISSIONER ST. JULIEN:**  You

13  need a binder. Put your stuff in a binder, okay?

14      **DEPUTY COMMISSIONER MEJIA:**  And that's -

15      **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah.

16  Okay, so thank you so much, sir. We'll adjourn

17  right here -

18      **DEPUTY COMMISSIONER MEJIA:**  We haven't

19  told him how much - how many years it's -

20      **PRESIDING COMMISSIONER ST. JULIEN:**  I

21  said a year. And it's 11:10 a.m. So get all that

22  together so that if there's something we need to

23  see that you don't think you can present it when

24  you come in, okay? All that stuff that you have

25  is - apparently you have a lot of stuff in there

26  cause you're doing a lot of work.

27  **M. CASTANEDA E-89355 DECISION PAGE 19 3/15/06**

91

1          **INMATE CASTANEDA:**  (indiscernible)

2          **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah.

3          **INMATE CATANEDA:**  (indiscernible)

4          **DEPUTY COMMISSIONR MEJIA:**  It should have

5    been submitted (indiscernible).

6          **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah,

7    but don't - this is your parole, okay?

8          **INMATE CATANEDA:**  (indiscernible) It

9    should be in there.

10         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

11   so get it all nice for us.  Okay?

12                              -oOo--

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED ONE YEAR**

24   **THIS DECISION WILL BE FINAL ON** <u>**07/13/2006**</u>

25   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **M. CASTANEDA  E-89355  DECISION PAGE 20  3/15/06**

92

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, SHERI ROBINSON, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total two in number and

cover a total of pages numbered 1 - 91, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF MARTIN

CASTANEDA, CDC NO. E-89355, ON MARCH 15, 2006, and

that the foregoing pages constitute a true, complete,

and accurate transcription of the aforementioned tape

to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated MARCH 30, 2006, at Sacramento,

California.




SHERI ROBINSON
TRANSCRIBER
PETERS SHORTHAND REPORTING
SHERI ROBINSON
TRANSCRIBER
**PETERS SHORTHAND REPORTING**